**STATE of Minnesota, Respondent,**

v.

**Anthony TENERELLI, Appellant.**

**No. C3–98–318.**

Supreme Court of Minnesota.

Aug. 5, 1999.

Rehearing Denied Sept. 2, 1999.

Michael A. Hatch, Atty. Gen., Susan Gaertner, Ramsey County Attorney, Darrell C. Hill, Asst. County Attorney, St. Paul, for respondent.

## OPINION

BLATZ, C.J.

Appellant, Anthony Tenerelli, was convicted of assault in the second and fifth degrees for an attack on Txawj Xiong and sentenced to 73 months in prison. Txawj Xiong then filed a victim impact statement and a request for restitution pursuant to Minn.Stat. §§ 611A.04 and 611A.045 (1996). He requested restitution for various expenses, including those relating to a traditional Hmong ceremony known as Hu Plig. Hu Plig involves the sacrifice of live animals to heal the soul of someone who has been physically and emotionally harmed. The trial court found that Txawj Xiong was entitled to restitution for the majority of his expenses, including most of the expenses relating to the Hu Plig ceremony. Appellant appealed the portion of the trial court's order granting restitution for expenses relating to the Hu Plig ceremony.[1] The court of appeals affirmed the trial court's order and this appeal followed. *See State v. Tenerelli,* 583 N.W.2d 1 (Minn. App.1998).

Appellant claims that section 611A.04 does not allow the state to order restitution for the Hu Plig ceremony. Further, appellant claims that if section 611A.04 does allow the state to order restitution for the Hu Plig ceremony, then the section as applied violates the Establishment Clause of the United States Constitution and article 1, section 16, of the Minnesota Constitution because Hu Plig is a religious ceremony. We hold that section 611A.04 allows the trial court to order restitution

John M. Stuart, Minnesota State Public Defender, Scott E. Korzenowski, Special Assistant State Public Defender, Lindquist & Vennum P.L.L.P., Minneapolis, for appellant.

1. Appellant also filed a direct appeal of his conviction, which was affirmed. *See State v. Tenerelli,* No. C2–97–1045, 1998 WL 113995 (Minn.App. March 17, 1998), *pet. for rev. denied* (Minn. May 20, 1998). Appellant could not appeal the restitution order in his direct appeal because the order was not issued until after appellant had filed his brief.

for the Hu Plig ceremony. We further hold that appellant failed to meet his burden of demonstrating that Txawj Xiong's Hu Plig ceremony was religious and thus the Establishment Clause is not implicated.

Appellant was convicted of second and fifth degree assault for his role in an attack on Txawj Xiong. Txawj Xiong suffered two stab wounds in his back that required sutures. The stabbing occurred in front of Txawj Xiong's wife and son. Following appellant's conviction, he was sentenced to 73 months in prison. Txawj Xiong filed a victim impact statement, a request for restitution, and an affidavit pursuant to sections 611A.04 and 611A.045. He requested restitution to repair his automobile that was damaged in the assault and to replace his T-shirt that was ruined as a result of the stabbing. He also requested restitution for expenses relating to the Hu Plig ceremony.

The victim impact statement, prepared by the corrections department and filed with the trial court, relied on the expertise of William Yang of the Hmong American Partnership. Yang was contacted by a probation department official to provide information on the Hu Plig ceremony. According to information provided by Yang in the victim impact statement, Hu Plig is a healing ceremony "to restore the soul of a victim, normally a person who has been physically or emotionally traumatized." Yang explained the "deeply held belief, particularly among elders of the Hmong community, that without the restoration ceremony the person will become sick and eventually die." The ceremony is overseen by a shaman, who is a spiritual leader in the Hmong community.

The Hu Plig ceremony involves the sacrifice of animals, and for Txawj Xiong's ceremony a cow, a pig, and two chickens were used. Family and close friends typically attend, and the beneficiary of the ceremony provides food for the guests. Txawj Xiong's expenses for the ceremony were for a suit and shirt to be worn during the ceremony, the animals for sacrifice, a pig to roast, and the costs incurred to pay a shao woman to conduct the ceremony. When added to the other expenses resulting from the assault, Txawj Xiong's reported expenses totaled $2,304.61, itemized as follows:

| | |
|---|---|
| $15.00 | Replacement T-shirt |
| $894.46 | Automobile repair |
| $380.00 | Suit for Hu Plig ceremony |
| $20.00 | Shirt for Hu Plig ceremony |
| $540.00 | Cow for sacrifice for Hu Plig ceremony |
| $90.00 | Pig for sacrifice for Hu Plig ceremony |
| $10.00 | Two chickens for sacrifice for Hu Plig ceremony |
| $155.15 | Roast Pig for Hu Plig ceremony |
| $200.00 | Shao woman to conduct Hu Plig ceremony |

Appellant objected to all of the expenses relating to the Hu Plig ceremony, and the trial court held a hearing to determine restitution on August 28, 1997. At the hearing, the court noted for the record that a victim impact statement had been submitted to the court, which included the information provided by Yang. The trial court went on to read the portion of the victim impact statement regarding the Hu Plig ceremony into the hearing record.

In opposing Txawj Xiong's request for restitution, appellant presented testimony from Neng Xiong, a native Laotian familiar with the Hmong culture. Neng Xiong had lived in the United States for 13 years, and had earned a bachelor's degree in sociology, a master's degree in cultural anthropology, and was pursuing a law degree at the time of the hearing. In addition to his formal education, he was raised in a traditional Hmong family and his father was a shaman.

Neng Xiong testified that 90 percent of the Hmong people living in the United States over the age of 40 [2] who have not converted to Christianity still believe in the traditional Hmong practices and ceremonies. Neng Xiong agreed with Yang's general description of the Hu Plig ceremony. Specifically, when questioned by appellant on redirect examination, Neng Xiong declined to characterize Hu Plig as a religious ceremony.

**2.** Txawj Xiong was 44 years old at the time of the offense.

Neng Xiong further testified that the number of animals needed for a Hu Plig ceremony depends on the severity of the victim's injuries. Based on his consultations with three elders in the Hmong community, he understood that the sacrifice of four animals would be appropriate for a "major" injury. However, he did not believe that the sacrifice of all four animals was necessary in the instant case because Txawj Xiong sustained what Neng Xiong characterized as a "medium" injury.

Following the hearing, the trial court issued an order adopting the testimony of Neng Xiong, the victim impact statement, the request for restitution and affidavit as the court's findings of facts. The court then concluded that Txawj Xiong was entitled to an order for restitution, and awarded restitution in the amount of $1,894.51. The court disallowed restitution for the suit and shirt because those items would be subject to future use. Further, the court did not allow restitution for the two chickens, because Neng Xiong's testimony demonstrated that the sacrifice of the chickens would be excessive given Txawj Xiong's injuries. Thus, the trial court ordered restitution for the following losses:

| | |
|---|---|
| $ 15.00 | Replacement T-shirt |
| $894.46 | Automobile repair |
| $629.90 [3] | Cow and pig for sacrifice for Hu Plig ceremony |
| $155.15 | Roast Pig for Hu Plig ceremony |
| $200.00 | Shao woman to conduct Hu Plig ceremony |

As noted earlier, appellant is only challenging those portions of the restitution order that result from the Hu Plig ceremony, totaling $985.05.

Appellant claims that the court of appeals erred in affirming the trial court's restitution order for those costs resulting from the Hu Plig ceremony. In support of his claim, appellant raises two arguments. First, appellant argues that section 611A.04 does not allow the state to order restitution for the Hu Plig ceremony. Second, appellant argues that section 611A.04 as applied violates the Establishment Clauses of the United States and

---

**3.** While the trial court calculated the cost of the cow and pig to be $629.90, the receipts filed with the trial court show the actual cost

Minnesota Constitutions. These arguments will be addressed in turn.

### I.

Appellant claims that section 611A.04 does not allow the trial court to order restitution for the Hu Plig ceremony. While we review the interpretation of statutes de novo, *see Doe v. Minnesota State Bd. of Med. Exam'rs*, 435 N.W.2d 45, 48 (Minn.1989), trial courts are given broad discretion in awarding restitution, *see State v. Maidi*, 537 N.W.2d 280, 284–86 (Minn.1995).

Section 611A.04, subd. 1(a), provides:

A request for restitution may include, *but is not limited to, any out-of-pocket losses resulting from the crime,* including medical and therapy costs, replacement of wages and services, * * * and funeral expenses.

(Emphasis added.)

We have recognized that this broad language gives the trial court significant discretion to award restitution for a victim's expenses. *See Maidi*, 537 N.W.2d at 284. Thus, we "may not construe the statute to exempt certain types of expenses, even though we may consider these expenses inappropriate. To do so * * * would run contrary to the clear language of * * * section[ ] 611A.04 * * *, delegating the decision to the sentencing court." *Id.*

Our recent decision in *State v. Maidi* demonstrates the broad scope of section 611A.04. In *Maidi*, we affirmed an order of the trial court granting restitution for counter-abduction expenses when the appellant was convicted of interfering with parental or custodial rights in violation of Minn.Stat. § 609.26, subd. 1(4), (6) (1994). *Id.* at 281. The trial court in *Maidi* awarded $147,251.27 for expenses incurred by the victim-mother in counter-abducting her children from Algeria. *Id.* The victim

---

to be $630.00. Therefore, we modify the restitution order to correct this error and award Txawj Xiong an additional $0.10.

had "contacted the 'International Program Group,' a team of former CIA and FBI special forces agents, and retained them to recover her children from Algeria." *Id.* at 282. Apparently, the counter-abduction violated the laws of Algeria. *Id.* at 286 (Page, J., dissenting).

■ In the present case, appellant argues that the trial court erred in awarding restitution for Txawj Xiong's Hu Plig healing ceremony. In support of his argument, appellant relies on language set forth in section 611A.045, subd. 1(a)(1), requiring that the trial court consider "the amount of economic loss sustained by the victim as a result of the offense" in awarding restitution. Appellant claims that the expenses of the Hu Plig ceremony are too far removed from appellant's crime to qualify as an appropriate economic loss. However, the subdivision relied on by appellant does not limit the scope of section 611A.04, subd. 1(a), which explicitly provides that "[a] request for restitution may include, but is not limited to, any out-of-pocket losses resulting from the crime." [4] This broad language clearly and unambiguously leaves the decision to award restitution to the discretion of the trial court, subject to review of an abuse of its discretion.

Given the broad statutory language of section 611A.04 and the record in this case, we conclude that the trial court was within its discretion in ordering restitution for the costs of Txawj Xiong's Hu Plig ceremony. We next address appellant's claim that section 611A.04 violates the Establishment Clauses of the United States and Minnesota Constitutions.

## II.

■ - As an alternative argument, appellant claims that section 611A.04 as applied violates the Establishment Clauses of the United States and Minnesota Constitu-

tions. We presume that Minnesota statutes are constitutional, and "our power to declare a statute unconstitutional should be exercised with extreme caution and only when absolutely necessary." *In re Haggerty,* 448 N.W.2d 363, 364 (Minn. 1989) (citation omitted). Because appellant challenges the constitutionality of section 611A.04, appellant bears the burden of demonstrating beyond a reasonable doubt that a constitutional violation has occurred. *Id.* (citation omitted).

Because the burden rests with appellant, appellant must first demonstrate that Txawj Xiong's Hu Plig ceremony was a religious ceremony. If appellant does not meet this initial burden, then we need not consider the substance of his constitutional argument.

■ Appellant failed to provide sufficient evidence before the trial court to satisfy his burden. Appellant called Neng Xiong as an expert in Hmong sociology and cultural anthropology. On redirect examination, Neng Xiong was asked if Hu Plig is "partially a religious ceremony." Neng Xiong replied that:

It is difficult to say because in the tradition itself, my understanding is that, from my cultural anthropology studies, that a religion has to be a form of belief that is institutionalized. But at the same time the Hmong also, this is a kind of a form of belief from thousands of years ago and the thing has never been institutionalized yet.

As discussed above, the burden of demonstrating that Txawj Xiong's Hu Plig ceremony was religious rests with appellant, and Neng Xiong's statement does not provide evidence to overcome this burden.

Appellant also relies on the information provided by Yang in the victim impact statement indicating that Txawj Xiong's Hu Plig ceremony was performed by a

---

4. We note that section 611A.04, subd. 1(a), also provides for restitution for "medical and therapy costs." The trial court made a finding of fact, supported by the record, that to many Hmong people Hu Plig is a form of healing and therapy. Specifically, Yang characterized Hu Plig as a healing ceremony for "a person who has been physically or emotionally traumatized."

shaman to support his claim that the ceremony was religious. However, while a shaman can be thought of as a religious leader, the record indicates that shamans also serve other functions in the Hmong community. Further, the record indicates that even some of the Hmong people who have converted to Christianity continue to engage in these traditional ceremonies.

Given the lack of evidence and minimal record before the trial court, appellant has not met his burden of demonstrating that Txawj Xiong's Hu Plig ceremony was religious. Accordingly, the trial court and court of appeals properly determined that the Establishment Clauses of the United States and Minnesota Constitutions are not implicated and appellant's claim that section 611A.04 is unconstitutional is without merit.

Affirmed as modified.

PAUL H. ANDERSON, Justice (concurring specially).

I concur with the majority's holding that, given the broad language of Minn. Stat. § 611A.04 (1998), the district court acted within its discretion in ordering appellant Anthony Tenerelli to pay restitution for the costs of Txawj Xiong's Hu Plig. I also agree with the majority's conclusion that Tenerelli did not meet his burden of demonstrating that Txawj Xiong's Hu Plig was a religious practice— we simply do not have in the record the information necessary to prudently conclude that Txawj Xiong's Hu Plig was or was not a religious practice. I write separately, however, because it is important to set forth the legal principles on which I base this conclusion.

A. Religion and/or Religious Practice

The United States Constitution prohibits a state from directly promoting or endorsing religion or religious activity. The First Amendment to the United States Constitution states that:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.

U.S. Const. amend. I. This First Amendment provision on religion has been construed to have two guarantees, the Free Exercise Clause and the Establishment Clause. While the amendment has two guarantees, the word religion only appears once and the definition of this one word governs both guarantees. *See Everson v. Board of Educ.*, 330 U.S. 1, 32, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (Rutledge, J., dissenting). As Justice Rutledge said in his dissent:

It [religion] does not have two meanings, one narrow to forbid "an establishment" and another, much broader, for securing "the free exercise thereof." "Thereof" brings down "religion" with its entire and exact content, no more and no less, from the first into the second guaranty, so that Congress and now the states are as broadly restricted concerning the one as they are regarding the other.

*Id.* Accordingly, what is religion or a religious practice is relevant regardless of which of the two guarantees, Free Exercise or Establishment, is being construed.

What is and what is not a religious practice is a difficult question to answer and the search for an answer has in many cases led to contradictory and arbitrary results when court-prescribed tests for religious practices have been applied. Such tests are indeterminate in nature and subject to variations in the general level of scrutiny employed. For example, when the three-pronged *Lemon* test, developed for interpreting the Establishment Clause, is "applied with particular rigor, the test yields one result, yet when applied in a less-exacting way to the same set of facts, the test can be made to yield an equally plausible, but contradictory result." *The Oxford Companion to The Supreme Court of the United States* 719 (Kermit L. Hall, et al., eds., 1992) (referencing *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)).

Nevertheless, the Supreme Court has articulated certain principles to be followed by courts when determining wheth-

er an activity is a religious practice. In *United States v. Ballard*, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944), Justice Douglas stated that:

> Men may believe what they cannot prove. They may not be put to the proof of their religious doctrine or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others.

*Id.* at 86, 64 S.Ct. 882. In *United States v. Seeger*, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), the Court attempted to develop a test for granting exemption claims for conscientious objectors who did not belong to an orthodox religious sect. Before doing so, the Court stated:

> Few would quarrel, we think, with the proposition that in no field of human endeavor has the tool of language proved so inadequate in the communication of ideas as it has in dealing with the fundamental questions of man's predicament in life, in death or in final judgment and retribution. This fact makes the task of discerning the intent of Congress in using the phrase "Supreme Being" a complex one. Nor is it made the easier by the richness and variety of spiritual life in our country.

*Id.* at 174, 85 S.Ct. 850. The Court then went on to hold that a court must decide whether an objector's beliefs are sincerely held and whether objectively

> the claimed belief occup[ies] the same place in the life of the objector as an orthodox belief in God holds in the life of one clearly qualified for exemption.

*Id.* at 184, 85 S.Ct. 850. Courts were not to require proof of the religious doctrines nor were they to reject beliefs because the beliefs were not comprehensible. *Id.* at 184–85, 85 S.Ct. 850.

### B. The Record Regarding Txawj Xiong's Hu Plig

It is in the context of these holdings and principles that we must consider the rec-

ord before us to determine whether the Hu Plig conducted for the benefit of Txawj Xiong constitutes a religious practice.

The record on the nature of the Hu Plig consists of two main parts: (1) the victim impact statement included with Tenerelli's presentence investigation report and (2) the testimony of Neng Xiong at the restitution hearing.[1] The relevant part of the victim impact statement reads as follows:

> Mark Richardson of the Ramsey County Probation Department contacted William Yang from the Hmong American Partnership. Mr. Yang informed Mr. Richardson that the healing ceremony was known as "Hu Plig." He reported that this was a ceremony to restore the soul of a victim, normally a person who has been physically or emotionally traumatized. Mr. Yang described a deeply held belief, particularly among elders of the Hmong community, that without the restoration ceremony the person will become sick and eventually die. Mr. Yang further stated that a shaman, a religious leader in the Hmong community, oversees this ceremony. Hu Plig typically involves the sacrifice of animals, in this case a cow, pig, and chickens. Upon sacrificing the animals the shaman is reported to inspect various aspects of the sacrificial animals, commonly the tongue and feet in an effort to determine whether the restoration has been successfully performed. Traditional belief is that the victim's soul is replaced by that of the animals. Mr. Yang further reported that the ceremony is generally attended by family members and other members of the Hmong community who are close to the victim. The ceremony normally includes the provision of food and beverage to those in attendance, paid for by the person benefiting from the Hu Plig ceremony.

---

1. Neng Xiong is Hmong, was born in Laos, emigrated to the United States when he was 17, and was 30 years old at the time he testified. Neng Xiong holds a bachelor's degree in sociology, a master's degree in cultural anthropology, and was a law student at the time he testified.

Tenerelli's witness, Neng Xiong, testified that he was familiar with Hmong religious practices—his father was a shaman, a Hmong religious leader—and that on a "couple [of] occasions" he accompanied his father to places where he observed rituals in which his father took part. When asked if he accepted traditional Hmong religious teaching, Neng Xiong responded, "at this time, not so much." Neng Xiong stated that from time to time he has discussed, particularly with elders, traditional Hmong ceremonies, teachings, and healing activity. He testified that there is a traditional Hmong belief that, as the result of a traumatic event or injury, a person can lose his soul and thus need a shaman ceremony. He agreed that elders in the Hmong community are especially involved in traditional healing ceremonies. He stated that about 90 percent of Hmong elders living in the United States who have not converted to Christianity still accept the traditional Hmong shaman healing ceremony.

Neng Xiong then testified specifically about the Hu Plig ceremony. The number and kind of animals sacrificed depends upon how big or small the injury is. The beneficiary of the Hu Plig determines, after consultation with his own elders, the number and kind of animals to be sacrificed. A cow, two pigs, and a chicken would be appropriate for a major injury, but a cow and one egg also would be appropriate for a "very serious injury." There are different levels of Hu Plig. Some Hmong who have converted to Christianity participate in the Hu Plig, but then they do not "perform the real shamanism, but they do call spirit." Neng Xiong went on to say the ceremony is "culturally evolving" and that "it is important for social, as well as the ritual calling purposes." When asked if the Hu Plig is partially a religious ceremony, Neng Xiong stated:

It is difficult to say because in the tradition itself, my understanding is that, from my cultural anthropology studies, that a religion *has to be a form of belief that is institutionalized.* But at the same time the Hmong also, this is a kind of a form of belief from thousands of years ago and the thing has never been institutionalized yet.

(Emphasis added.)

Neng Xiong also testified that he did not know Txawj Xiong and did not know if Txawj Xiong was an elder. When asked "the extent of what [Txawj Xiong] considered his injury or how much soul he feels he lost," Neng Xiong responded that he did not know. There is no other information on the record that clarifies whether Txawj Xiong is a Hmong elder and the degree to which he accepts and practices traditional Hmong religious beliefs.[2]

C. Record Does Not Support Unequivocal Conclusion that Txawj Xiong's Hu Plig Was or Was Not a Religious Practice

The key to our analysis of whether Txawj Xiong's Hu Plig is or is not a religious ceremony turns on the fact that it appears there are different levels at which the Hu Plig ceremony is conducted. The record indicates that, depending upon the belief of the beneficiary, the Hu Plig in some circumstances may be a cultural and social ceremony and, in others, may be a religious practice. Thus, at least in part, the question of whether the Hu Plig is religious appears to depend on the nature of the beliefs of the individual for whom the ceremony is conducted. The victim impact statement indicates that Txawj Xiong "went through a Hmong traditional healing ceremony," but there is no evidence on the record of Txawj Xiong's beliefs and no clarifying information on his beliefs or his purpose in having the Hu Plig. Neng Xiong conceded that it was

---

**2.** The dissent states that there is no dispute as to Txawj Xiong's "deeply held belief." Unlike the dissent, I am unable to find support for this statement in the record. In the victim impact statement, William Yang of the Hmong American Partnership described a "deeply held belief, particularly among elders of the Hmong community," but there is nothing in the record to link this statement directly to the beliefs of the victim Txawj Xiong.

difficult for him to say whether the Hu Plig was a religious practice, but according to his anthropological studies, he understood that a belief must be institutionalized to be religious and that the Hu Plig is not institutionalized.

While there is much on this record that leads me to believe that under certain circumstances a Hu Plig may be in whole or in part religious, it is unclear whether Txawj Xiong's beliefs concerning his Hu Plig are religious, cultural, or some mix of both. Clearly there is insufficient evidence to conclude, as the dissent does, that there is no dispute in this case that the victim's belief supports the position that this particular Hu Plig was a religious ceremony.

Ultimately, as the majority concludes, this case must be decided on the basis of who has the burden of proof and whether that party has carried his burden. Tenerelli, by challenging the constitutionality of the application of Minn.Stat. § 611A.04, has the burden of proving that paying restitution for Txawj Xiong's Hu Plig is unconstitutional. This is a heavy burden. When making a constitutional challenge, a party must demonstrate beyond a reasonable doubt that a constitutional violation has occurred. *In re Haggerty*, 448 N.W.2d 363, 364 (Minn.1989). Tenerelli's argument may contain some merit for, in certain circumstances and to certain individuals, the Hu Plig may well be a religious ceremony. Nevertheless, Tenerelli has failed to demonstrate that Txawj Xiong's Hu Plig was conducted at a "level" such that it must be viewed as a religious practice rather than at a level that does not meet the constitutional standard for a religious practice. Accordingly, given the broad language of Minn.Stat. § 611A.04 and the broad discretion granted to the district court, the court did not err when it ordered Tenerelli to pay restitution for certain costs associated with the Hu Plig conducted for the benefit of Txawj Xiong.

Because Tenerelli has failed to carry his burden of showing that the Hu Plig at issue was a religious practice, there is no need to conduct an analysis of whether the Establishment Clause of the U.S. Constitution and art. 1, § 16 of the Minnesota Constitution were implicated and violated. However, some further comment on this point is warranted. Courts must proceed in every case with considerable caution when exercising their broad discretion in making restitution under Minn.Stat. § 611A.04. They must do so to ensure that there is no excessive entanglement with religion. Here, the district court determined that based upon the nature and extent of the injury suffered by Txawj Xiong, a Hu Plig that includes the sacrifice of a cow, a pig, and two chickens is excessive because of the two chickens sacrificed. Had we had sufficient information to conclude that the Hu Plig was religious, the district court's determination that the sacrifice of two chickens was excessive would come uncomfortably close to entangling the courts with religious authority. When courts exercise their broad discretion in granting restitution, they must be ever mindful of the dimly perceived "lines of demarcation in this extraordinarily sensitive area of the law." *Lemon*, 403 U.S. at 613, 91 S.Ct. 2105.

GILBERT, Justice (dissenting).

I respectfully dissent. In ordering restitution for the Hu Plig ceremony, which involves the sacrifice of animals to restore the victim's soul, the trial court evaluated and delved into significant religious and spiritual traditions. This constitutes excessive entanglement, and thus the trial court's application of the restitution statute violated the United States and Minnesota Constitutions. *See* U.S. Const. amend. I; Minn. Const. art. I, § 16.

The United States Constitution provides generous accommodation of all faiths and cultures and their various forms of religious expression. *See generally Lynch v. Donnelly*, 465 U.S. 668, 673–78, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984); *see also Hill–Murray Fed'n of Teachers v. Hill–Murray High Sch.*, 487 N.W.2d 857, 865 (Minn.

1992) (construing Minn. Const. art. I, § 16 to afford even greater protection of religious liberties than that afforded by the Federal Constitution). In affording individuals the opportunity to pursue their own religious beliefs and practices, however, the government may not become excessively entangled with or impermissibly supportive of religion. *See Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). To pass constitutional muster, a governmental action must have a secular purpose, must have a principal effect that neither advances nor inhibits religion, and "must not foster 'an excessive government entanglement with religion.' " *Id.* (citation omitted). "Judicial caveats against entanglement must recognize that the line of separation [between necessary and permissible contact and excessive entanglement], far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." *Id.* at 614, 91 S.Ct. 2105.

The trial court and court of appeals both determined that the Hu Plig ceremony was not religious and, accordingly, required appellant to pay for the cost of the ceremony. However, the lower courts erred in finding that the Hu Plig ceremony was not religious based almost exclusively on the testimony of Neng Xiong, who declined to characterize the Hu Plig ceremony as a religious ceremony because it had not been "institutionalized." However, the "institutionalization" test adopted by the trial court does not conform to the objective test established by the United States Supreme Court. *See United States v. Seeger,* 380 U.S. 163, 184, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965).

In *Seeger,* the United States Supreme Court recognized "the richness and variety of spiritual life in our country" and the diverse forms of expression these religions encompass. *Id.* at 174, 85 S.Ct. 850. The Court stated that a belief is religious if it is a "sincere and meaningful [belief that] occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God." *Id.* at 165–66, 85 S.Ct. 850. Thus,

to determine whether a belief is religious, a court must decide whether it is sincerely held and whether it is, objectively, religious. *See id.* at 184, 85 S.Ct. 850.

There is no dispute in this case regarding the sincerity of the victim's deeply held belief. There is, however, a dispute as to whether the Hu Plig healing or soul restoration ceremony is religious. This court now must determine the resolution of that dispute. The answer to the religious question is dependent on whether the ceremony "occupie[d] a place in [the victim's] life parallel to that filled by the orthodox belief in God." *Id.* at 166, 85 S.Ct. 850. In concluding that the Hu Plig ceremony is not religious, the trial court ignored the *Seeger* test, instead relying exclusively on an expert witness' statement that the ceremony had not been "institutionalized."

Had the trial court used the appropriate test in determining whether the Hu Plig ceremony was religious, several undisputed facts would have led it to the conclusion that the ceremony was religious. According to the victim impact statement, which is not contradicted in the record, the Hu Plig ceremony is based on the belief that the "victim's soul is replaced by that of animals," and that without the restoration of the soul through the Hu Plig ceremony, the victim will become sick and eventually die. Although specific practices differ among religions, many religions focus on the existence and restoration of the soul. Furthermore, the Hu Plig ceremony is performed by a shaman ("holy man") or shao woman ("holy woman"). It is undisputed in the record that these holy people are "religious leader[s] in the Hmong community." Thus, they are objectively as vital to the Hu Plig ceremony as other religious officials are in other religions. Thus, the appellant has met his burden of proof that the Hu Plig ceremony is, from an objective perspective, religious, regardless of the institutionalization of that ceremony.

The trial court became excessively entangled in religious beliefs by picking and

choosing what portions of the Hu Plig ceremony were compensable. The trial court ordered that appellant pay restitution for the costs of two of the sacrificed animals, a cow and a pig. However, the trial court then determined that the victim was not entitled to restitution for the sacrifice of two chickens because, based on the extent of the victim's injuries, that sacrifice was "excessive." It is inappropriate for the trial court to evaluate the necessity of certain aspects of the victim's religious practices and disallow reimbursement for those practices that the trial court does not deem "appropriate."

As Justice Douglas stated, "Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs." *United States v. Ballard,* 322 U.S. 78, 86, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). "[T]he 'truth' of a belief is not open to question, [and thus] there remains [only] the significant question whether [the belief] is 'truly held.'" *Seeger,* 380 U.S. at 185, 85 S.Ct. 850. The lower courts and the majority of this court avoid the excessive entanglement issue by classifying the Hu Plig ceremony as nonreligious. However, as previously discussed, under the objective *Seeger* test the Hu Plig ceremony was religious. Accordingly, the trial court should only have determined whether the victim's belief was sincerely held, an issue that is undisputed in this case. Yet the trial court went on to require the victim to prove that his religious beliefs and practices were not "excessive," thereby thrusting the judiciary into the religious or spiritual realm. The majority opinion now ratifies this error by continuing to require the victim to prove the appropriateness of his religious beliefs. Judicial determination of "appropriate" religious practices constitutes excessive entanglement and places the judiciary in an untenable position.

We must heed the United States Supreme Court's warning about mixing government and religion: "[c]andor compels acknowledgement * * * that we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law." *Lemon,* 403 U.S. at 612, 91 S.Ct. 2105. "Ordinarily political debate and division, however vigorous or even partisan, are normal and healthy manifestations of our democratic system of government, but political division along religious lines was one of the principal evils against which the First Amendment was intended to protect." *Id.* at 622, 91 S.Ct. 2105 (citations omitted).

Even though this case may not *per se* involve political divisions along religious lines, the majority's decision leads to broader ramifications and to the potential for political divisiveness related to religious beliefs and practices. The power of the state, through the courts, has been invoked against the wishes of the appellant, who has been compelled to support and maintain portions of this religious practice. As the Supreme Court reminded us in *Lemon,* the difficulty is that trial courts must now draw the lines of religious demarcation. *See id.* at 612, 91 S.Ct. 2105. This area may now become a battle of experts on religious and spiritual practices with no discernable bounds, except what a judge determines to be appropriate or non-excessive.

Accordingly, I would reverse the court of appeals and the trial court and quickly remove the courts from the religious arena.