**STATE of Minnesota, Respondent,**

v.

**Craig Dennis BJORK, Appellant.**

**No. C8–99–924.**

Supreme Court of Minnesota.

May 18, 2000.

Rehearing Denied June 7, 2000.

Bradford S. Delapena, Assistant State Public Defender, Minneapolis, for Appellant.

Michael A. Hatch, Minnesota State Attorney General, St. Paul, and Doug Johnson, Washington County Attorney, Kari A. Lindstrom, Christopher K. Wachtler, Assistant Washington County Attorneys, Stillwater, for Respondent.

## OPINION

PAGE, Justice.

Following a jury trial in Washington County District Court, Appellant Craig Dennis Bjork, an inmate at the Minnesota Correctional Facility–Stillwater (MCF–STW), was convicted of murder in the first degree in violation of Minn.Stat. §§ 609.185(1) (1998) and 609.184, subd. 2 (1998),[1] and murder in the second degree in violation of Minn.Stat. § 609.19, subd. 1(1) (1998), for the November 27, 1997 killing of fellow inmate Edwin Curry, Sr.[2] Bjork was sentenced on the first-degree murder conviction to a term of life in prison without the possibility of release, to run consecutively with the sentences he was serving at the time of Curry's murder. Bjork now brings this direct appeal from the judgment of conviction claiming that errors by the trial court and his trial counsel violated his right to a fair trial. Because we conclude that Bjork's trial was fair,[3] we affirm.

Bjork and Curry were workers in MCF–STW's kitchen. Bjork's duties usually involved cleaning garbage cans and Curry's involved recycling. At approximately 10:00 a.m. on November 27, 1999, corrections officer John Sward found Bjork alone in the kitchen's basement recycling area using a hose to wash away what appeared to be large amounts of blood on the floor. Suspecting some kind of wrongdoing, Sward asked Bjork, "What is going on?" Bjork replied, "It's these beet cans making

---

1. This statute was repealed and recodified at Minn.Stat. § 609.106, subd. 2 (1998). *See* Act of Apr. 6, 1998, ch. 367, art. 6, §§ 3, 16, 1998 Minn. Laws 667, 727, 735.

2. At the time he killed Curry, Bjork was incarcerated at MCF–STW serving consecutive sentences for three separate first-degree murder convictions plus a separate consecutive sentence for second-degree murder and was not eligible for supervised release on those convictions until 2056.

3. In his pro se brief, Bjork requests that this direct appeal be stayed until such time as he has had a chance to pursue claims of ineffective assistance of counsel and voir dire violations by way of a postconviction petition. In addition, he seeks an order of this court requiring his appellate counsel to request the voir dire transcript from his trial, thereby enabling him to properly raise his voir dire violation claims. We note that in his pro se brief, Bjork links the voir dire violation claims with the ineffective assistance of counsel claims.

We have said that the preferred method for raising a claim of ineffective assistance of counsel is in a postconviction proceeding before direct appeal. *See Fratzke v. State*, 450 N.W.2d 101, 102 n. 3 (Minn.1990). Given the manner in which these two issues have arisen, however, we see no reason to stay this appeal pending their resolution in a postconviction proceeding. Therefore, we deny Bjork's request for a stay. Notwithstanding our denial of the stay, we preserve Bjork's right to have the ineffective assistance of counsel and voir dire violation issues addressed in a postconviction proceeding.

a big mess." When Sward told Bjork that the mess did not appear to have been made by beet cans, Bjork dropped the hose and said, "I got to get out of [ ] here," and left the area.

Instead of pursuing Bjork, Sward followed a set of drag marks on the floor, leading to an overturned garbage cart in a room referred to as the garbage room. Lifting the garbage cart, Sward found Curry with a plastic bag partially covering his face, lying in the fetal position, covered with blood and struggling to breathe. The area was secured and Curry was transported to Regions Hospital, where he died at approximately 1:10 p.m. that afternoon.

After securing the area, MCF–STW staff began searching for Bjork. He was found in the dining hall, eating a candy bar and drinking a cup of milk. As he was escorted to the prison security center, Bjork made the following statements: "[Y]ou are lucky a guard came when he did otherwise there would be three more bodies laying there." "I told those motherfuckers they should get me out of D Hall." "None of this would have happened if they would have got me out of D Hall like I told them to." At the security center, Bjork said to one of the corrections officers that "it was nothing personal but a few minutes more and you would have had a dead guard on your hands also." When the corrections officer replied that he might someday have to repeat Bjork's statement, Bjork replied, "Well, that is okay, because I don't care. I'll see you in court."

Bjork was first interviewed by a corrections department investigator. When asked what happened in the basement, Bjork did not respond directly to the questions, but instead complained that he had been denied telephone privileges by the way other inmates managed telephone usage on his cell tier. Bjork also referred to killing a corrections officer, and said he wanted to do it on Thanksgiving because Christmas would have been too late.

That afternoon, Bjork was interviewed by and gave a statement to investigators from the Washington County Sheriff's Office and the Department of Corrections. The interview was audiotaped, transcribed, and played for the jury. In the interview, Bjork states that he was angry with MCF–STW staff because, although he had asked to be moved to a different cell tier over seven weeks earlier and had recently been told that he would be moved before Thanksgiving, they had failed to move him. Bjork said he knew when he went to bed the night before and when he awoke that morning that he would kill someone that day, and that he had intended to kill a staff member. By doing so, Bjork hoped to send a message to MCF–STW's administration not to "play [ ] games" with people. According to the statement, he wanted "enough dead bodies to get enough media attention." He indicated that although he did not like Curry, the attack was not personal and Curry was just in the right place at the right time. He also indicated that after killing Curry, he had hoped to kill other inmates. When Bjork was asked if he attacked Curry just because he was closest, Bjork responded, "There's a saying in the business world, location, location, location, huh, location is everything." While giving the statement to the Washington County Investigator, Bjork repeatedly asked about Curry's condition, stating that he did not care if Curry died. Before finding out that Curry had died, Bjork stated, "I wish the son of a bitch was dead."

When asked about the murder weapon, Bjork said that shortly before Thanksgiving he had found and hidden a three-foot section of pipe in the kitchen's basement. He had also hidden a shorter section of pipe that he had planned to use to kill MCF–STW staff members. He referred to this shorter section of pipe as the "staff killer."

Bjork described killing Curry as follows. Earlier that morning, while in the kitchen, he observed the corrections officer on duty

for a while, then went to the basement. While Curry was at the recycling sink removing can labels, Bjork retrieved the three-foot section of pipe from its hiding place, approached Curry from behind, and hit him in the back of the head as if swinging a baseball bat. Curry was temporarily knocked into the sink, but he stood back up. Bjork then hit him in the head at least another eight times before crushing his windpipe. When Bjork was convinced that Curry was dead, he dragged Curry's body into the garbage room and covered it with a garbage cart. He rinsed the pipe, washed himself off, changed into a clean shirt he had brought along, placed the shirt he had been wearing in a bag in the garbage, and began hosing down the floor, at which point Officer Sward arrived.

The Bureau of Criminal Apprehension (BCA) was called to process the crime scene. BCA agents found a three-foot section of pipe, partially covered with blood, standing in one corner of the recycling area and a shorter section of pipe in a milk crate. A paper bag containing a bloody shirt was discovered in a garbage cart. The recycling sink and the surrounding area were heavily spattered with blood. Blood spatter analysis established five impact sites, the first was sixty inches high and directly in front of the sink, the others were further from the sink and lower to the ground. Shoe prints recovered from the floor matched the shoes Bjork was wearing when he was taken to the security center. Bjork's left shoe contained bloodstains consistent with being a mixture of Bjork and Curry's blood. The three-foot section of pipe and items of Bjork's clothing, including the shirt found in the garbage cart, were all stained with blood consistent with Curry's. A search of Bjork's cell produced a notebook, the first page of which was captioned "November" and contained an entry, written in red and underlined, for the 27th that read "Should have moved me, punks."

An autopsy revealed that Curry died from head and neck injuries caused by blunt trauma. Curry suffered fourteen major injuries to his head, including multiple skull fractures. Blunt trauma to Curry's neck caused a massive hemorrhage in the airway and fractured the thyroid cartilage, the superior horn, and the hyoid bone. Curry also suffered twenty less serious injuries to other parts of his body and face, at least six of which were consistent with defensive wounds.

At his trial, Bjork's testimony was significantly different from the statement he gave to the Washington County Sheriff's investigator. Bjork testified that he had known Curry for a little more than one year, that they both held service jobs in the prison kitchen, and that for a period of time they lived in the same cell hall. Approximately two weeks before the murder, Curry started calling Bjork a "sissy boy" and a "punk," and saying that Bjork needed a "daddy." Bjork took those comments to mean that Curry was suggesting that he could not take care of himself and that Curry would protect him in exchange for sexual favors. The Thursday before Thanksgiving, Curry pressed the issue while he and Bjork were working in the basement. Eventually, Bjork told Curry he would not be Curry's "punk," and Curry knocked him unconscious. When he came to, he was alone and his pants were down, exposing his buttocks.

The following Monday, while Bjork was at his work station, Curry came up behind him, grabbed him by the hair, and threatened to cut his throat with a can lid if he moved. When Bjork said he would not move, Curry unsnapped Bjork's pants, inserted his finger into Bjork's rectum, and then rubbed his penis on Bjork's buttocks, causing Bjork to be terrified. The encounter ended when Curry simply walked away. Afterwards, according to Bjork, Curry continued to humiliate him by calling him "punk" and "bitch."

According to Bjork, he went to work on Thanksgiving morning hoping to finish his

duties in the basement as quickly as possible. Before he could finish, however, Curry entered the basement and approached Bjork, saying that he was going to sexually assault Bjork that day. Bjork asked Curry to leave him alone, but instead Curry punched Bjork in the stomach three or four times and hit him once on the head. Feeling scared, Bjork retrieved a three-foot section of pipe he claimed that he had left in the basement in case he should someday need a weapon. When Curry lunged at him, Bjork swung the pipe without making contact. Curry then said to Bjork, "I'm going to fuck you and cut your fucking throat," and ran to the recycling sink and started removing a can lid. While Curry was retrieving the can lid, Bjork came up behind Curry and hit him on the head, causing Curry to momentarily bend over the sink and then stand back up. Bjork next hit him on the shoulder to make Curry drop whatever he was holding. This blow caused Curry to fall. Afraid that Curry might get up and kill him, Bjork continued to hit Curry until Curry stopped trying to get up, at which point he panicked and dragged Curry's body to the washroom and hid it under a garbage cart. Bjork then cleaned up and changed into an extra shirt he claimed he kept in his work area because of the dirty nature of the work. As he began hosing down the blood on the floor, he was confronted by Officer Sward. In his testimony, Bjork admitted giving the statement to the Washington County Sheriff's Investigator, but claimed he had contrived the story he gave during the statement because telling the truth would have demonstrated weakness to the other inmates who would then have subjected him to further abuse.

At trial, Bjork sought to introduce evidence of the violent nature of the prison environment at MCF–STW, as well as general evidence of prison assaults. His purpose in having this evidence admitted was to give the jury insight into the violent nature of prison life in order to assist the jury in understanding why his reaction to Curry's alleged assault on November 27, 1997 was genuine and reasonable. The trial court permitted the introduction of some general evidence about what happens to snitches in prison and about the dangers of prison life, but it limited the evidence regarding prison assaults to those involving Bjork and Curry.

The primary issue raised in this appeal is whether the trial court erred when it limited the introduction of evidence at trial concerning the violent nature of the prison environment and excluded evidence of assaults by inmates in the prison that did not involve Bjork and Curry. In his pro se brief, Bjork raises the additional issues of: (1) whether the trial court protected Bjork's right to self-representation; (2) whether the trial court record sufficiently reflects evidentiary rulings; and (3) whether the trial court erred in its restitution award to the victim's family.

■ We first address Bjork's argument that the trial court erred when it limited the introduction of evidence relating to the violent nature of life at MCF–STW and excluded evidence of assaults by inmates that did not involve Bjork and Curry. A trial court's evidentiary rulings will not be overturned absent a clear abuse of discretion. *See State v. Kelly*, 435 N.W.2d 807, 813 (Minn.1989). Bjork claims that the trial court's error here prevented him from putting on a complete defense. A defendant has the right to present a complete defense. *See Bixler v. State*, 582 N.W.2d 252, 255 (Minn.1998). That right, however, is not unlimited. *See id.* (holding that district courts have wide latitude to limit a defendant's right to present a complete defense if evidence is repetitive, marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues).

■ Bjork's defense at trial was self-defense. We have stated that, "The elements of self-defense are by nature very specific to the person apprehending fear and the very particular circumstances

causing fear." *State v. Nystrom*, 596 N.W.2d 256, 260 (Minn.1999). Bjork argues that in order to prevail on his claim of self-defense, he had to convince the jury that he had an "actual and honest belief that he [ ] was in imminent danger of death or great bodily harm" and that he had "reasonable grounds for that belief." *Id.* Thus, he claims it was necessary for the jury to hear evidence of the violent nature of MCF–STW's environment, including evidence of assaults by inmates upon one another, in order to understand why his actions in killing Curry were genuine and reasonable. At trial, Bjork's defense counsel explained:

> [W]hat I am trying to point out in this testimony to this jury is that prison is a totally different atmospheric circumstance than civilian society is, and the options that are available to the average person in society aren't available to someone in prison, and that [a] person's perceptions are different, albeit reasonable.

Bjork urges us to consider a case decided by the North Carolina Supreme Court, in which evidence relating to the prisoner's pervasive fear of harm by other inmates, the violent nature of a prison's environment, and prior attacks on the defendant by inmates other than the victim was held admissible to support an inmate's self-defense claim. *See State v. Spaulding*, 298 N.C. 149, 257 S.E.2d 391, 397 (1979). In *Spaulding*, the defendant, while in the prison's recreation yard, stabbed another inmate who had given him trouble earlier that day. *See id.* at 394. The defendant had armed himself with a knife before going to the prison's recreation yard because he believed, based on the earlier conversation with the victim, that the victim might try to stab him during recreation. *See id.* On the day of the stabbing, the victim, with his hands "jammed" in his pockets and saying nothing, approached the defendant who had repeatedly indicated to the victim that he did not want any trouble. *See id.* When the victim did not

stop approaching, the defendant stabbed the victim. *See id.*

We view *Spaulding* as distinguishable and of no assistance on the facts presented here. *Spaulding* is different in that the threat posed by the victim to the defendant was not as clear or as immediate as the threat Bjork testified Curry posed to him. Therefore, in *Spaulding*, evidence of pervasive fear, the violent nature of the prison environment, and other attacks defendant suffered was likely to be helpful to the jury in determining the reasonableness of the defendant's fear and violent actions.

In contrast, Bjork testified that he was responding to a direct and immediate threat of sexual assault and death when he attacked Curry. Bjork testified that Curry had physically and sexually assaulted him on two earlier occasions and that during the events leading up to Curry's death, Curry threatened to sexually assault and kill him, punched him in the stomach and head and then went to the sink to get a can lid to use as a weapon. Given the immediacy of these events, evidence of the violent nature of MCF–STW's environment and prison assaults not involving Bjork and Curry, was not likely to be helpful to the jury in determining the genuineness and reasonableness of Bjork's fear and violent actions. Applying our holding in *Nystrom* to the facts and circumstances that Bjork contends caused him fear of death or great bodily harm, it is clear that the evidence excluded by the trial court was not relevant and the exclusion of that evidence was not an abuse of discretion.

■ Bjork next claims that the trial court failed to protect his right to self-representation. *See State v. Richards*, 552 N.W.2d 197, 205 (Minn.1996) (acknowledging criminal defendant's constitutional right to represent himself); *see also* U.S. Const. amend. VI. The record belies this claim. During jury selection, Bjork made a motion to waive his right to counsel and represent himself. At that time, Bjork claimed that there had been turmoil

between him and his counsel, that he had not had sufficient time with his counsel, that his counsel had not explained any of his legal rights to him, and that he did not trust his counsel. Bjork's trial counsel disagreed with Bjork's assessment of the representation. Noting that it appeared that Bjork had been effectively represented, the trial court in some detail informed Bjork of the consequences of his decision to represent himself and the difficulty of self-representation. The trial court then asked Bjork if he still wanted to represent himself. After some discussion and a recess, Bjork indicated that he would represent himself and that his decision was being made under duress. After further discussion about what Bjork meant by saying his decision was being made under duress, the trial court dismissed Bjork's attorneys, appointed them as standby counsel, and, at the state's request, examined Bjork pursuant to *State v. Rubin*, 409 N.W.2d 504, 506 (Minn.1987) (setting out questions courts should ask defendants to insure that waiver of right to counsel is voluntary and intelligent). To ensure that Bjork was making a voluntary and intelligent waiver of his right to counsel, the judge asked him about the charges against him, the maximum punishment he would face if convicted, and any possible defenses he might assert. *See id.* Finally, the trial court appointed temporary counsel to consult with Bjork about his decision to waive trial counsel. After consulting with his temporary counsel, Bjork elected to proceed to trial with the previously dismissed counsel. Based on the record before us, we conclude that Bjork's right to self-representation was scrupulously protected by the trial court.

■ Bjork also claims that the trial court erred when it ordered him to pay $2,686.64 in restitution to Curry's family for funeral expenses. Specifically, he objects to being ordered to pay $300 to the VFW Women's Auxiliary, $422.65 for flowers, $51.24 for photographs, $13.20 for printing of the eulogy, $13.90 for music,

and $64 for postage. This claim fails. Based on our reading of the record, we conclude that the trial court's restitution order was entirely proper. *See* Minn.Stat. §§ 611A.04 and 611A.045 (1998); *see also State v. Tenerelli*, 598 N.W.2d 668, 672 (Minn.1999) (affirming restitution award for costs associated with a Hmong Hu Plig ceremony, holding that the ceremony fit within the statutory definition of "any out-of-pocket losses resulting from the crime").

As for Bjork's claim that the trial court record does not sufficiently reflect the trial court's evidentiary rulings, we have reviewed the record and conclude that this claim has no merit.

Affirmed.