STATE of Minnesota, Appellant,

v.

Said Moussa GOULEED, Respondent.

No. A04–700.

Supreme Court of Minnesota.

Sept. 7, 2006.

Mike Hatch, Attorney General, Susan Gaertner, Ramsey County Attorney, Jeanne L. Schleh, Asst. Ramsey County Attorney, St. Paul, MN, for appellant.

Michael F. Cromett, Assistant State Public Defender, Minneapolis, MN, for respondent.

## OPINION

MEYER, Justice.

Said Moussa Gouleed was found guilty of second-degree unintentional felony mur-

der for the death of his 6–week–old daughter. He was retried after the district court in the first trial sua sponte ordered a mistrial because of a discovery violation by the defense's expert witness. The court of appeals reversed the orders declaring a mistrial and denying the motion to bar a retrial, and reversed Gouleed's conviction.[1] We determine that the record of the first trial showed a manifest necessity for a mistrial because Gouleed's expert failed to disclose testing he had done related to a critical evidentiary issue in the trial, and we conclude that Gouleed was not unconstitutionally subjected to double jeopardy. We reverse the court of appeals in part, reinstate Gouleed's conviction, and remand for resentencing.

At about 7:30 p.m. on November 8, 2002, Gouleed's wife took the couple's 2½-year-old son and left their 6–month–old infant, F.M., in Gouleed's care. The complaint alleged that Gouleed told officers that, while he was watching F.M., he took F.M. out of her crib to give her a bottle because she was crying. Gouleed also told officers that he tripped over an infant chair while carrying F.M., causing him to drop her. He said her head hit the floor, then she "jumped" up and her head hit the wall.

According to Gouleed's wife, when she returned a little after 9 p.m., she found Gouleed cradling F.M., who was not breathing. Gouleed's wife called 911, and F.M. was taken to Children's Hospital in St. Paul where she was pronounced dead just after 11 p.m.

---

1. The court of appeals' ruling on the double-jeopardy issue was dispositive. But the court also found that the district court violated the rule articulated in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), when it imposed a 75–month upward durational departure from the presumptive 150–month sentence for second-degree murder. *State v. Gouleed*, No. A04–700, 2005 WL 1216294, at *11 (Minn.App. May 24, 2005). Further, the court of appeals found that the admission of testimony from hospital personnel about their feelings about the death of F.M. was erroneous, but that it likely did not have a significant effect on the verdict. *Id.* at *11–12. The court of appeals' decision on these issues was not appealed to this court.

Dr. Michael McGee, the Ramsey County medical examiner, performed an autopsy on F.M. the next day. Dr. McGee documented the following injuries: significant, depressed fractures on both sides of her skull; multiple healing fractures to her ribs; bi-lateral femur fractures; healing fractures of a forearm, wrist, and finger; contusions on her head, face, chest, and arms; and bruising on both of her legs. According to the complaint, Dr. McGee's provisional report concluded that the cause of death was injuries resulting from child abuse and the manner of death was homicide. Gouleed was charged with second-degree unintentional felony murder in violation of Minn.Stat. § 609.19, subd. 2(1) (2004).[2]

The defense hired an expert forensic pathologist, Dr. John Plunkett, assistant coroner for the Minnesota Regional Coroner's Office, whose practice is focused on infant head injuries. On July 18, 2003, several months before his testimony, Dr. Plunkett issued a letter reporting his opinion on the cause of F.M.'s death. He based his opinions on his review of clinic and hospital records, Dr. McGee's autopsy report, including photos and microscopic slides, a consultation report from an ophthalmologist and another doctor, as well as police reports. Dr. Plunkett did not indicate that he had conducted any testing in preparing his report. He referred to microscopic slide evidence in his report stating that "[b]oth impact sites [on F.M.'s head] are associated with a large number of iron-positive macrophages in the inflammatory infiltrate * * *. The iron-positiv[i]ty means that at least a portion of the hemorrhage and associated injury occurred at least 4–5 days before her death." He specifically referenced Dr. McGee's microscopic slides numbered 11, 16, and 18 containing samples taken from F.M.'s scalp, and slides T1 through T4 containing samples taken from the dura membrane.[3] Dr. Plunkett opined that "[e]ven the skull fracture or fractures could have occurred significantly earlier" than November 8, 2002. Dr. Plunkett concluded that it was unlikely that an accident like that described by Gouleed would have caused F.M.'s death "unless a preexisting injury contributed to the fatal outcome."

In preparation for trial and with Gouleed's counsel present, the state interviewed Dr. Plunkett and questioned him at length about his letter report. He said in the interview that it was "likely that this child had the [skull] fractures four or five days before [her death]." In the interview, Dr. Plunkett repeated his opinion that the microscopic slides indicated that F.M. had significant preexisting brain injuries, and he mentioned that iron pigment in microscopic slides from the injured area supported his position. But he did not indicate that he had performed his own testing on slides he had received from Dr. McGee.

After delays prompted by Dr. Plunkett's schedule,[4] Gouleed's trial began October

2. Whoever does either of the following is guilty of unintentional murder in the second degree and may be sentenced to imprisonment for not more than 40 years: (1) causes the death of a human being, without intent to effect the death of any person, while committing or attempting to commit a felony offense other than criminal sexual conduct in the first or second degree with force or violence or a drive-by shooting * * *.

Minn.Stat. § 609.19, subd. 2(1) (2004).

3. The scalp covers the outer surface of the skull; between the skull and scalp is the periosterum; inside that is a membrane called the dura; under the dura, attached to the brain, is the arachnoid membrane.

4. Dr. Plunkett earlier had failed to comply with a court-ordered deadline for submission of his report.

31, 2003. On November 4, Gouleed moved for a mistrial after Dr. David Kispert, a neuroradiologist who had reviewed a CT scan of F.M.'s injuries, testified that he did not agree with the opinion attributed to him in another doctor's report that there were indications of subdural blood of various ages in F.M.'s head injuries. Gouleed argued that a mistrial was "absolutely necessary" because the state had failed to disclose a meeting it had had with Kispert before trial. The court denied the motion for a mistrial but struck all of Kispert's testimony.

Gouleed requested another mistrial the next day when a juror cried during Dr. McGee's testimony. That motion also was denied.

In his trial testimony, Dr. McGee stated that the microscopic slide evidence showed injury in the thighs and head, but that these previous head injuries were not causally related to F.M.'s death. Dr. McGee said that a fall as described by Gouleed could not have caused the injuries that killed her. Dr. McGee also indicated that his examination revealed subdural and subarachnoid hemorrhaging, as well as hemorrhaging at the base of F.M.'s brain. He noted he had seen accidental injuries such as she had suffered only in unrestrained children who had been in car accidents; F.M. could not have carried on normal activities for four to five days with such injuries; and it was unlikely that her 2½-year-old brother could have caused such injuries. He concluded that F.M. died from at least three impacts that had occurred within hours of her death, resulting in closed head trauma and produced by child abuse.

On cross-examination, Dr. McGee agreed that iron slides (i.e., autopsy samples stained with iron) were needed to effectively date F.M.'s subdural hematoma, and he indicated iron slides had been done in F.M.'s case. Defense counsel did not further inquire about the nature, extent, or results of the iron-staining, nor did the defense ask when the staining had been done or who had done it. The prosecutor, on direct examination, had not specifically asked Dr. McGee about the iron-stained microscopic slides and did not follow up with any questions about iron-staining on redirect. No microscopic slides or images of microscopic evidence were admitted during Dr. McGee's testimony.

The defense called Dr. Plunkett as an expert witness. After the typical questions about Dr. Plunkett's credentials, defense counsel established the foundation for admission of exhibits Dr. Plunkett would rely on during his testimony:

Q [By defense attorney] Showing you what's been marked Exhibit 90 through 101. Do you recognize those?

A Yes, sir, I do.

Q Okay. What are those?

A These are prints of a power point presentation that I prepared from slides from the autopsy on [F.M.].

Q Okay. And how do you know that these documents are from [F.M.]?

A Well, I received the slides from the Ramsey County Coroner's Office. I looked at the slides, which had a key to go with the slides. The key corresponded with the slides that I was looking at. And so I assume that those, in fact, did come from [F.M.].

Q Did the slides and the codes from the autopsy correspond with what you were looking at under the microscope?

A Yes, they did. And I have labeled the slides—the designations on these slides. 14 refers to slide number 14. And I used A, B, C, D or E for various magnifications [sic] powers.

And it's listed, the staining and the magnification power is listed.

[Defense attorney]: Your Honor, I would offer Exhibit 90 through 101.

[Prosecutor]: No objection, Your Honor. The Court: Exhibits 90 though 101 are received without objection.

Dr. Plunkett proceeded to testify, illustrating his analysis of F.M.'s injuries with photographs of the slides; each exhibit had two images. In testimony covering 12 pages of transcript, Dr. Plunkett showed and discussed 13 of the images: three of samples taken from F.M.'s right thigh, two of which were iron-stained; and 10 of samples taken from her head, six of which were iron-stained. Dr. Plunkett testified specifically about iron-stained slides of samples from the left and right occipital scalp (apparently in the same areas where there were skull fractures), saying they showed evidence of injury occurring at least four or five days before F.M.'s death. In the course of his testimony, Dr. Plunkett said the iron-staining was done because, "It's the best way to try to date something that may be more than four to five days old."

In short, Dr. Plunkett testified specifically and in some detail about iron-staining, stating that it supported his conclusion that F.M. had head injuries that significantly predated her death. Dr. Plunkett's testimony was more specific than Dr. McGee's general acknowledgement that there was evidence of old hemorrhage in F.M.'s head injuries and that iron-staining could date a subdural hematoma.

After discussing 12 separate images, Dr. Plunkett indicated, to the apparent surprise of both parties, that *he* had iron-stained the slide to which he was referring.

The state interrupted and, after a discussion off the record, defense counsel asked Dr. Plunkett:

Q Are these exhibits the way that you got them from the pathologist of Dr. McGee?

A They are labeled. 35 corresponds to Dr. McGee's slide 35. 18 corresponds to Dr. McGee's slide 18 and so forth[.]

Q And did you do anything to these slides? These are as they came; is that correct?

A Well, the H & E's[5] are as they came. The irons are as I did them.

Q You did those?

A Yes.

The state objected and the jury was removed. Defense counsel indicated that he thought Dr. Plunkett was testifying based on the slides as prepared by Dr. McGee. The state contended that it was surprised by Dr. Plunkett's staining, which the state described as "obviously * * * critically relevant to what he's testifying to." The state made a motion to strike all of Dr. Plunkett's testimony, maintaining that if it had known that Dr. Plunkett had done his own iron-staining, it would have objected when the exhibits were offered for admission. The state further argued that striking Dr. Plunkett's entire testimony was the only fair thing to do because the court had already struck Kispert's testimony. Gouleed opposed the motion to strike on the grounds that it would leave Gouleed without support for his theory of the case and argued that Dr. Plunkett's July 2003 report had been adequate disclosure.

The court stated that the undisclosed testing represented evidence that went to "the very essence of this case." The court called a recess to take the state's motion

**5.** "H & E" stands for hematoxylin and eosin—another method of dating blood in hemorrhages.

under advisement and give the state a chance to review Dr. Plunkett's photos with Dr. McGee and consider remedial steps; the court specifically noted the possibility of a continuance. The bulk of the discussion upon reconvening roughly two hours later concerned the nature of the discovery violation and how it came about.[6] There was no discussion on the record as to the contents or the results of the state's discussions with Dr. McGee. With regard to remedy, Gouleed argued that Dr. Plunkett's testimony should not be stricken, and instead proposed that the court allow Dr. Plunkett to continue to testify regarding the iron positivity in F.M.'s cells and his conclusions based on it, but preclude Dr. Plunkett from showing additional photographs and have the jury disregard the pictures that were shown.

The court reasoned that because Dr. Plunkett had used his iron-stained slides to create the July 2003 report, the defense had an obligation to disclose the additional testing at that time, and that instructing the jury to disregard the testimony may not be an adequate remedy. The court indicated it was "in the mode of saying that there's a mistrial," because it did not want to deprive the defendant of his case. Nonetheless, the court took another break to allow the parties to consider the options of a continuance to prepare for rebuttal (presumably by Dr. McGee) or mistrial. After the recess and, apparently, some discussion in chambers, the court indicated that it had decided on a mistrial and noted its expectation that retrial would begin December 1.

What followed was an effort to put the parties' conflicting positions on the record.

The state indicated that it opposed a continuance, arguing that no rebuttal could undo the impression that Dr. Plunkett had "exposed the state and the state has to try to respond. I don't think there's any way to get around that by a continuance." As such, the state indicated that a continuance was "not adequate." Defense counsel requested a continuance rather than a mistrial, but noted, "I've been told that that's not going to happen"—apparently referring to an off-the-record conversation in chambers.

The court declared a mistrial, then explained its decision to the jury:

> [Q]uite frankly, with the stuff that was coming in today from defendant's expert, I saw no way that I could tell you to disregard certain portions of the testimony. Nor do I think it would have been fair to the defendant to disqualify his expert * * *. He would have been left without any expert.
>
> So with those being the options, the state felt that a continuance into next week might not have been appropriate. They just didn't know if they had the time that they could have gotten with their experts to look at the slides that were coming in.

There is no discussion on the record of the possible double-jeopardy consequences of a mistrial.

Before retrial, Gouleed moved to dismiss the charge on double-jeopardy grounds. The district court denied the motion, stating that "the state was deprived of a fair trial when the defense did not provide full disclosure of its expert's basis for opinions going to [the] very heart of the issue—the age of the injuries."

---

**6.** Gouleed had originally been represented by attorney William Mauzy. Mauzy withdrew in April 2003, though, when it appeared he would be called as a witness in the case. Eric Olson took over Gouleed's defense. The autopsy slides had been given to Dr. Plunkett by Mauzy, not Olson. The record does not establish that either of Gouleed's attorneys was aware of Dr. Plunkett's iron-staining.

The second trial commenced on December 1, 2003. Gouleed employed a different expert for the second trial. The jury in the second trial found Gouleed guilty and he was sentenced to 225 months in prison. Gouleed appealed to the court of appeals. The court of appeals reversed the orders declaring a mistrial and denying the motion to bar the retrial, and reversed Gouleed's conviction, saying that it was "unable to reach any principled conclusion that there was a manifest necessity for a mistrial or that the [trial] court and counsel appropriately investigated and examined measures short of a mistrial to remedy the discovery violation." *State v. Gouleed*, A04–700, 2005 WL 1216294, at *10–11 (Minn.App. May 24, 2005). This appeal followed.

 Both the federal and state constitutions prohibit trying a criminal defendant twice for the same crime. U.S. Const. amend. V; Minn. Const. art. 1, § 7.[7] A criminal defendant who objects to the declaration of a mistrial cannot be retried unless there was a "manifest necessity" for the mistrial or the ends of public justice would otherwise be defeated. *Illinois v. Somerville*, 410 U.S. 458, 461, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973) (citing the "fountainhead" decision on a mistrial granted over defendant's objection, *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824)); *State v. Fuller*, 374 N.W.2d 722, 726 (Minn.1985); *State v. Gwara*, 311 Minn. 106, 108–09, 247 N.W.2d 417, 419 (1976).

 The application of the constitutional protection against double jeopardy is reviewed de novo. *State v. Leroy*, 604 N.W.2d 75, 77 (Minn.1999). But we review trial court decisions to declare a mistrial sua sponte without the consent of the defendant for an abuse of discretion. *State v. Miller*, 573 N.W.2d 661, 675 (Minn.1998). Review of the district court's decision, though, is rigorous, because a constitutionally protected interest of the defendant is implicated by mistrial. *See Arizona v. Washington*, 434 U.S. 497, 514, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978) (stating that "reviewing courts have an obligation to satisfy themselves that * * * the trial judge exercised 'sound discretion.'"). We have stated, "A high degree of necessity—not absolute necessity—must exist before a mistrial is appropriate." *State v. Long*, 562 N.W.2d 292, 296 (Minn.1997), *habeas corpus granted by Long v. Humphrey*, 184 F.3d 758 (8th Cir.1999).

The Supreme Court has noted the fact-intensive quality of the manifest necessity standard. *Somerville*, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (noting that the standard "abjures the application of any mechanical formula," *id.* at 462, 93 S.Ct. 1066; and "virtually all of the cases turn on the particular facts and thus escape meaningful categorization," *id.* at 464, 93 S.Ct. 1066); *see also United States v. Jorn*, 400 U.S. 470, 480, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) (noting, in a case affirming the application of the Double Jeopardy Clause to bar retrial, that "a mechanical rule prohibiting retrial * * * would be too high a price to pay for the added assurance of personal security and freedom from governmental harassment"). We likewise have found that the standard is a flexible one that seeks to achieve fairness for the prosecution, the defendant, and the public interest. *Long*, 562 N.W.2d at 296 (citing *United States v. Givens*, 88 F.3d 608, 613 (8th Cir.1996)).

 There is no dispute about whether there was a discovery violation in Gou-

---

7. In *State v. Fuller* we declined, on the facts of the case, to interpret the double-jeopardy prohibition in the Minnesota Constitution more broadly than the United States Supreme Court had interpreted the identical federal standard. 374 N.W.2d 722, 727 (Minn.1985).

leed's first trial. Rather, the issue is whether there was a manifest necessity for the mistrial. As the Court noted in *Arizona*, the intensity of the scrutiny applied to a decision to grant a mistrial is a function of the nature of the trial problem that prompted the motion: "[I]t is manifest that the key word 'necessity' cannot be interpreted literally; instead, contrary to the teaching of Webster, we assume that there are degrees of necessity and we require a 'high degree' before concluding that a mistrial is appropriate." 434 U.S. at 506, 98 S.Ct. 824. A request for a prosecutor to buttress weaknesses in the state's evidence cannot be justified, *id.* at 507, 98 S.Ct. 824, whereas, a mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict has long been considered the classic basis for a proper mistrial, *id.* at 509, 98 S.Ct. 824. In this case, while the state cannot have been wholly surprised by the nature of Dr. Plunkett's testimony, it is evident in the record that, before trial, Dr. Plunkett deliberately and repeatedly avoided revealing that he had conducted additional testing on the autopsy samples, a violation of the spirit and letter of the discovery rules. Minnesota Rule of Criminal Procedure 9.02, subd. 1(2), requires the defense, upon request, to disclose the results of tests that will be introduced or relate to testimony of one of its witnesses. Dr. Plunkett's evasiveness, exacerbated by defense counsel's apparent failure to effectively communicate with its witness, resulted in a trial problem that was not caused by government overreaching.

We agree with the district court's observation that the discovery violation went to the very heart of the state's case, in contrast to the court of appeals' conclusion that "[t]he sole function of the undisclosed slides was to corroborate a point that was not in contention," *State v. Gouleed*, No. A04–700, 2005 WL 1216294, at *6 (Minn. App. May 24, 2005). We observe that the iron-stained slides provided a visual basis and critical support for Dr. Plunkett's conclusion that some of F.M.'s injuries significantly predated her death. Dr. Plunkett's nondisclosure cannot be characterized as an inconsequential detail related to an uncontested point—indeed, the medical significance of the prior injuries was the only real issue at trial. *See State v. Lindsey*, 284 N.W.2d 368, 374 (Minn.1979) (noting that "[t]he values sought to be achieved through reciprocal discovery will be attained only if the rules are properly observed, and to this end the trial courts must have the ability to make those obligations meaningful."). The iron-staining was new evidence to which the state would have had to respond, and the state should have had this evidence in advance of trial.

The discrepancy between the court of appeals' and the district court's assessments of the impact of the undisclosed iron-staining evidence on the fairness of the proceedings implicates the well-established maxim that the district court is "best situated to decide whether, for compelling reasons, 'the ends of substantial justice cannot be attained without discontinuing the trial.' " *Long*, 562 N.W.2d at 296 (quoting *Gori v. United States*, 367 U.S. 364, 368, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961)); *see also Long*, 184 F.3d at 761 (noting that "mere disagreement with the [trial] court's conclusion is not enough to warrant habeas relief.") (citation omitted). The district court arrived at a dispositive conclusion that there was "no way that I could tell you [the jury] to disregard certain portions of the testimony. Nor do I think it would have been fair to the defendant to disqualify his expert * * *." Ultimately, the court granted the mistrial

based on its determination that continuing the trial would not be fair to either party.

Gouleed argues that deference should not be given to the district court because it failed to discuss the double-jeopardy consequences of a mistrial on the record and failed to fully explore alternatives less drastic than a mistrial. Whatever the shortcomings of the district court's consideration of ramifications, the mistrial decision cannot be said to have been made rashly or altogether without consideration of alternatives. The court took two recesses to allow the parties to ascertain the nature of the violation and to consider remedies. Discussions in chambers were had. A continuance and the excision of testimony were at least considered by the court.

The difficulties of Gouleed's trial (the delays, the two prior mistrial motions, the striking of the testimony of one of the state's witness) and the dramatic confusion as to who iron stained which slides compel deference to the district court's perspective. The record here, while somewhat lacking, does not present the situation found in *Jorn*, where the Court noted that the trial court "made no effort to exercise a sound discretion to assure that, taking all the circumstances into account, there was a manifest necessity for the *sua sponte* declaration of this mistrial." 400 U.S. at 487, 91 S.Ct. 547 (affirming that double jeopardy precluded retrial where the trial court acted "abruptly," such that the parties had no time to discuss alternatives to mistrial); *id.* at 487–88, 91 S.Ct. 547 (Burger, C.J., concurring) (noting that the "frustration of the right to have this case tried [was] attributable solely to the conduct of the trial judge.").

We conclude that Gouleed's right to have his trial completed by a particular tribunal is an interest that must be subordinated to the public interest in fair trials designed to end in just judgments. *See Arizona*, 434 U.S. at 505, 98 S.Ct. 824.[8] The Supreme Court has said that a trial judge properly exercises his discretion when he declines to continue a trial after an error has occurred that will undoubtedly subject a verdict of conviction, if one is reached, to reversal. *Somerville*, 410 U.S. at 464, 93 S.Ct. 1066. Striking all or some of Dr. Plunkett's testimony was a remedy available to the court, but such a remedy would have been a severe sanction for a discovery violation. *See State v. Freeman*, 531 N.W.2d 190, 197–98 (Minn.1995). Ordering the case to be retried preserved Gouleed's ability to fully present his defense and avoided a trial error that would have undoubtedly subjected a verdict of conviction to reversal. *See State v. Bjork*, 610 N.W.2d 632, 636 (Minn.2000) (noting that a criminal defendant has a right, albeit not an unlimited one, to present his defense).

Policy reasons weigh against prohibiting the retrial of Gouleed. The constitutional protection against double jeopardy is rooted in the idea that

> the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States*, 355 U.S. 184, 187–88, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957); *see also Jorn*, 400 U.S. at 479, 91 S.Ct. 547

8. We note that Gouleed's invocation of the policy in favor of concluding a criminal trial in a single proceeding is undermined by his failure to appeal the denial of his double-jeopardy motion before retrial. *See* Minn. R.Crim. P. 28.02, subd. 2(2)3 (allowing appeal as of right from an order denying a double-jeopardy motion).

(noting that permitting repeated government prosecutions would cut deeply into double-jeopardy protections). We do not find anything in the record to suggest that the state took any action to precipitate the mistrial. To permit the defendant's key witness to commit a serious discovery error and then to bar retrial of the case would not serve the principles rooted in the double-jeopardy doctrine.

We reverse the court of appeals' reversal of the district court's orders declaring a mistrial and denying the motion to bar retrial. We reinstate Gouleed's conviction and remand to the district court for resentencing in accord with the court of appeals' opinion. *Gouleed*, 2005 WL 1216294, at *11.

Reversed in part and remanded.

PAGE, Justice (dissenting).

I respectfully dissent. In reversing the court of appeals, the court concludes that the trial court did not abuse its discretion in declaring the mistrial. I do not understand how the court can reach that conclusion when the trial court never considered the defendant's constitutionally protected interest against double jeopardy and, therefore, failed to apply the manifest-necessity standard for declaring a mistrial. *See Arizona v. Washington,* 434 U.S. 497, 506, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978) (stating a reviewing court has the obligation to ensure that the trial courts exercised sound discretion in declaring a mistrial).

The record indicates that during trial the state's medical expert, Ramsey County Medical Examiner Dr. Michael McGee, testified that based on his examination he believed that F.M. died from several skull fractures that she suffered shortly before her death. According to Dr. McGee, F.M.'s injuries were the result of child abuse and not a fall as described by Gouleed. Dr. McGee further testified that, although he found evidence of other, earlier injuries in F.M.'s thighs and head, he believed that these injuries, which were sustained before November 8, were not causally related to F.M.'s death. On cross-examination, Dr. McGee agreed that iron-staining was needed to effectively determine when F.M.'s skull fractures had occurred and he indicated that he had performed iron-staining in F.M.'s case.

In order to counter Dr. McGee's testimony, Gouleed presented expert testimony from Dr. John Plunkett. Dr. Plunkett was of the opinion that Gouleed's actions on November 8 were not the cause of F.M.'s death. Relying on the iron positivity in iron-stained autopsy slides, Dr. Plunkett testified that the injuries that caused F.M.'s death occurred four or five days before F.M.'s death. The state objected to Dr. Plunkett's testimony when Dr. Plunkett indicated that he had performed independent iron-staining on some of the autopsy slides. A bench conference out of the hearing of the jury ensued. During that conference, the state requested that the trial court strike Dr. Plunkett's testimony in its entirety, stating:

Here we've got a series of slides that the state has never seen and a whole series of testimony about those slides which are the slides [Dr. Plunkett was] testifying to to date these injuries. A critical issue in this case.

Gouleed's counsel responded that Dr. Plunkett's testimony should not have been "a huge shock" to the state because Dr. Plunkett had previously indicated in his July 18, 2003, report that the iron positivity means that at least a portion of the hemorrhage and associated injury occurred at least four to five days before F.M.'s death.

In response, the state argued that the issue was not whether "this is an old injury," which was acknowledged by Dr. McGee, but rather "there's brand new slides that have never been disclosed before that [Dr. Plunkett] dropped on us for the first time. And [Dr. Plunkett] is testifying regarding issues that are very prejudicial to the state on those very slides." The state did not claim that either Dr. Plunkett's testimony regarding the iron-staining done on the slides or the slides themselves contained any new evidence or facts, or resulted in any defense theories that were previously unknown to the state.

After listening to these arguments, the trial court declared a recess to give the state "the opportunity to take either the slides or the photographs and talk to [Dr. McGee]," so that the parties "can revisit the issue of whether or not, based on the disclosure made, that the state has been harmed." The court also announced that it was going to "look very seriously at the lack of disclosure" because "we're talking about the very essence of this case." After the recess, the state informed the trial court that it "did get a chance to talk to [Dr. McGee]" and "it appears that what Dr. Plunkett had done is he received * * * an unstained set of slides [from the state,] [w]hich he has done his own procedures with in terms of staining for purposes of iron positivity." Again, the state did not claim and there is no evidence in the record indicating that the iron-staining done by Dr. Plunkett produced evidence or facts or resulted in new defense theories that were previously unknown to the state.

The trial court agreed with the state that "the disclosure [regarding Dr. Plunkett's own iron testing] should have gone to the direction of the state," but stated that it was "not in a position at this point in time to tell the jury to disregard the testimony of Dr. Plunkett." Rather, the court was "more in the mode of saying that there's a mistrial[,] and we're going to start over again" because the court did not "see any way out of it." The court explained that if it granted the state's request to strike then "[i]n this case we don't have anybody else to present the defendant's argument," but it would not be "fair" to the state if the court "let the discovery violation go."

The court stated:

So what's the result? I mean to make it fair, we should have a much faster trial starting Monday than we are if this one gets kicked out today. That's what I'd like to hear argument about as to whether with the remedy that I'm not going to disregard Dr. Plunkett's testimony, there are two things that could happen: The state could have enough time to go over the exhibits with their expert and have him prepared for rebuttal testimony. Or I could go into the mode of saying we're going to start over entirely.

* * * *

If you need some more time to think about my two standards right now. Continuance for an examination of the evidence for rebuttal, its medical people. Whether [Dr. McGee] is available may not be an issue for me right now. He's going to have to be available. He's on call for this week. So he's under subpoena. I don't care where he is[,] he still has to be here.

And the same thing with your people. So that's what I'm facing right now. So if you need some time to consult each other and then deal with the court, that's what I'm looking for: Either a continuance or a mistrial.

Further, the court did not believe that "a curative instruction to disregard [relevant slides]" was "going to cure [the discovery violation]."

After a short break, the trial court asked the state if there was anything the state wanted to put on the record. The state responded:

Only just, Your Honor, to indicate that the state is concerned that a continuance of this trial not be an adequate remedy for the state.

Had the state been aware of the different slides earlier, we would have had our expert look at them. It may have— I don't know until I have someone look at them. But it may have changed the way we put in our opening statement. It may have changed the way we brought in much of our testimony.

Certainly at this point, I think, it gives the appearance, if we just get a continuance and try to rebut the evidence, that somehow [Dr. Plunkett] has come in and exposed the state and the state has to try to respond. I don't think there's any way to get around that by a continuance.

The only option the state had brought to the court was to have [Dr. Plunkett's] testimony stricken. If this is not stricken, the state feels like a continuance is not adequate.

Gouleed's counsel indicated to the court Gouleed had requested him to "ask for the continuance versus the mistrial." The trial court then declared: "Okay. It's my intent then to bring the jury in and to direct them that the case, as far [as] they're concerned, is closed and they're done. And I'll declare the mistrial."

In this appeal, the parties disagree as to whether and to what degree Dr. Plunkett's failure to provide full disclosure with respect to the slides he stained constituted a discovery violation. The state asserts in its brief that Dr. Plunkett committed a discovery violation that "could not have been more serious, either in substance or in timing, and it must be imputed to the defense." Gouleed acknowledges only that there may have been a technical violation of the discovery rules. We need not, however, decide whether a discovery violation occurred because, even if we assume that the defense's conduct at issue was a violation and therefore warranted some sanction by the district court, any violation that could have occurred does not justify the trial court's decision to grant a mistrial.

As the court notes, both the United States and Minnesota Constitutions prohibit a criminal defendant from being tried twice for the same crime. U.S. Const. amend. V; Minn. Const. art. 1, § 7. The United States Supreme Court has held that a criminal defendant who objects to a mistrial being declared may not be retried unless there was a "manifest necessity" for the mistrial or the ends of public justice would otherwise be defeated. *Illinois v. Somerville,* 410 U.S. 458, 461, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). We have said, "A high degree of necessity—not absolute necessity—must exist before a mistrial is appropriate." *State v. Long,* 562 N.W.2d 292, 296 (Minn.1997), *habeas corpus granted by Long v. Humphrey,* 184 F.3d 758 (8th Cir.1999). And, as the Supreme Court noted in Arizona, "the key word 'necessity' cannot be interpreted literally; instead, * * * we require a 'high degree' before concluding that a mistrial is appropriate." 434 U.S. at 506, 98 S.Ct. 824. On this record, no showing of a high degree of necessity to declare a mistrial can be made. Therefore, the trial court's grant of the mistrial was inappropriate.

As identified above, the state's objection to Dr. Plunkett's independent iron-staining of some of the slides was not that the staining presented new evidence or a new theory that the state was not aware of and could not respond to in the absence of a new trial, but rather that Gouleed failed to inform the state that Dr. Plunkett had conducted his own iron-staining. Presum-

ably, the state did not object based on Dr. Plunkett's independent iron-staining presenting new evidence or a new theory because Dr. Plunkett's testimony about what the slides he tested showed was consistent with his reasoning and opinion from his July 18 report, which the state had reviewed. As such, Gouleed's discovery violation, if any, was procedural rather than substantive.

And, to the extent that the record does not show a substantive discovery violation, there is no basis for the trial court's implicit conclusion that any remedy short of a mistrial would be inadequate to address the violation. Moreover, a careful review of the record reveals, and the state does not claim to the contrary, that Dr. Plunkett's testimony about the iron-staining did not result in any evidence that was inconsistent with the July 18 report or, with the exception of the conclusion reached, Dr. McGee's testimony. Specifically, both experts agreed that F.M. had injuries to her skull that predated November 8, 2002, and that iron-staining provides evidence that aids in determining the specific time of the injury. Further, there is nothing in the record that would indicate that the state could not have responded substantively to Dr. Plunkett's testimony by recalling Dr. McGee. The state did argue that recalling Dr. McGee to rebut Dr. Plunkett's testimony could leave the jury the impression that "somehow [Dr. Plunkett] has come in and exposed the state and the state has to try to respond. I don't think there's any way to get around that by a continuance." A review of the record indicates that that argument cannot be supported. As discussed earlier, Dr. McGee had previously testified with respect to the purpose of iron-staining and the fact that F.M. had old injuries to her skull. Although the district court considered the possibility of granting a continuance so that the state could recall Dr. McGee to rebut Dr. Plunk-

ett's testimony, it dismissed that option without explaining its reasoning. In the absence of that explanation, our review is made more difficult. Had the court considered the manifest-necessity standard, it would likely have placed its reasoning on the record, thereby facilitating our review.

The state argues here that Dr. Plunkett's testimony left the jury with the impression that the state was, at best, either unprepared, negligent, or incompetent, and, at worst, intentionally hiding exculpatory evidence, i.e., Dr. McGee had failed to conduct the necessary iron-staining. Given Dr. McGee's trial testimony regarding the purposes of iron-staining and his testimony that he had performed iron-staining of his own, this argument lacks merit. The state also argues that it would have been irreversibly damaged by having to respond to the iron-staining done by Dr. Plunkett on rebuttal. Yet the state does not explain, and the district court failed to inquire, as to whether or how Dr. Plunkett's testing presented evidence that was in some substantive way different from what had been acknowledged by Dr. McGee at trial or disclosed by the defense before trial. As noted previously, to the extent that iron-staining of the slides only aided in determining the time, and not the extent of F.M.'s injuries, there is nothing in the record that would indicate that the state could not have rebutted Dr. Plunkett's testimony by recalling Dr. McGee.

It is disconcerting that no one raised the issue of double jeopardy or considered, except in the most cursory and perfunctory way, whether a continuance might resolve the problem, or whether rebuttal might completely offset any harm, if there were any, done by the violation.

It is of similar concern that neither the court nor counsel referred to or intimated any awareness of the mani-

fest-necessity standard that governs the declaration of a mistrial after jeopardy attaches. Fixated on the fact of a discovery violation, the court, without any apparent manifest-necessity analysis, proposed that a mistrial, the most drastic sanction, likely would be the way to rectify the violation. Neither counsel provided any manifest-necessity analysis to assist the court in appreciating the gravity of the proposed mistrial sanction.

*State v. Gouleed,* No. A04–700, 2005 WL 1216294, at *7 (Minn.App. May 24, 2005).