# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1256

_____

Said Moussa Gouleed,                          *
                                              *
              Petitioner-Appellant,           *
                                              *   Appeal from the United States
      v.                                      *   District Court for the
                                              *   District of Minnesota.
Timothy Wengler,                              *
                                              *
              Respondent-Appellee.            *

_____

Submitted: November 18, 2009
Filed: December 23, 2009

_____

Before MURPHY, SMITH, and BENTON, Circuit Judges.

_____

MURPHY, Circuit Judge.

Said Moussa Gouleed was tried in Minnesota state court for the unintentional felony murder of his infant daughter. After Gouleed's expert witness revealed at trial that he had tested autopsy evidence in a manner not previously disclosed to the prosecution, a mistrial was declared over Gouleed's objection. Gouleed was retried and convicted. The Minnesota Court of Appeals vacated his conviction on double jeopardy grounds, but the Minnesota Supreme Court reversed and reinstated it.

Gouleed then petitioned for a writ of habeas corpus, which the federal district court[1] denied. Gouleed timely appealed. We affirm.

I.

While his wife was away, Gouleed was caring for his six week old daughter Faduma on the evening of November 8, 2002. His wife returned home shortly after 9 p.m. to find him cradling the infant who was not breathing. Paramedics were summoned, and Faduma was rushed to the hospital. Attempts to revive her were unsuccessful and she was pronounced dead around 11 p.m. Gouleed told police that he tripped while carrying Faduma and dropped her, causing her head first to hit the floor and then the wall.

The Ramsey County medical examiner, Dr. Michael McGee, performed an autopsy on Faduma and found a number of significant injuries, some of which were new and some of which appeared older. The injuries included fractures to her skull, arms, legs, and ribs as well as multiple contusions on her head, face, chest, and arms. Dr. McGee did not believe that the fall Gouleed described could have caused the head trauma that killed Faduma. He concluded instead that the injuries were the result of child abuse and that the death was a homicide.

Gouleed retained a forensic pathologist, Dr. John Plunkett, to offer an opinion about the cause of Faduma's death. Based on the autopsy evidence and other records, Dr. Plunkett concluded that significant portions of Faduma's head injuries had been sustained several days before November 8. In his opinion the prior injuries had rendered Faduma extremely fragile so that even a minor fall could have killed her.

---

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

Gouleed's theory of defense was that his two and a half year old son had caused the underlying injuries which ultimately led to Faduma's death.

Dr. Plunkett's conclusion that Faduma's head injuries were several days old was based on the results of iron stains he had applied to microscope slides containing samples from Dr. McGee's autopsy.[2] The parties were originally unaware that Dr. Plunkett had altered the slides. Although he discussed the inferences he had drawn from the iron stains in both his report and in a pretrial interview with the prosecution, he did not reveal before trial that he was the one who had applied the stains. When Dr. Plunkett testified at trial that he had applied the iron stains, the state moved to strike all of his testimony. Gouleed opposed the motion, for Dr. Plunkett was his only witness and his sole evidentiary support for his defense. The trial court remarked that the undisclosed iron stains went to "the very essence of [the] case." State v. Gouleed, 720 N.W.2d 794, 798 (Minn. 2006). It then took a recess to consider the state's motion and allow the parties to discuss possible remedial steps.

Upon reconvening, the trial judge indicated that he was inclined to declare a mistrial, but he took a second recess to allow the parties to consider the options of a mistrial or a continuance. When they reconvened, the parties put their conflicting positions on the record. Gouleed opposed a mistrial, arguing for a continuance instead, which would give the state adequate time to allow Dr. McGee to review Dr. Plunkett's iron stains and prepare a rebuttal. The state argued that a continuance was an inadequate remedy because no rebuttal could dissipate the impression that the state had failed to perform important tests on the evidence and had been forced to improvise a response to Dr. Plunkett's testimony.

---

[2]Iron staining is commonly used in forensic analysis to date injuries. Under a microscope, an iron stain reveals the presence of hemosiderin containing macrophages that generally appear in the area of a hemorrhage several days after an injury. See Manfred Oehmichen et al., Forensic Neuropathology & Neurology 190–98 (James Heywood trans., 2006).

The court declared a mistrial after concluding that a curative jury instruction would be inadequate and that striking Dr. Plunkett's testimony would decimate Gouleed's defense. The judge explained the dilemma to the jury: "I saw no way that I could tell you to disregard certain portions of the testimony. Nor do I think it would have been fair to the defendant to disqualify his expert. He would have been left without any expert." Id. at 799 (alteration omitted).

Before his second trial, Gouleed moved to dismiss the charge on the ground of double jeopardy. The trial court denied this motion, declaring that "the state was deprived of a fair trial when the defense did not provide full disclosure of its expert's basis for opinions going to the very heart of the issue—the age of the injuries." Id. (alteration omitted). Gouleed was convicted and sentenced to 225 months in prison. The Minnesota Court of Appeals vacated his conviction after concluding that the mistrial had not been justified by manifest necessity and that the retrial had therefore been unconstitutional.

The Minnesota Supreme Court reversed and reinstated Gouleed's conviction. It observed that "before trial, Dr. Plunkett deliberately and repeatedly avoided revealing that he had conducted additional testing on the autopsy samples, a violation of the spirit and letter of the [Minnesota] discovery rules." Id. at 801. The supreme court agreed with the trial judge's conclusion that the discovery violation had severely compromised the fairness of the first trial. It further concluded that the trial judge had adequately considered the alternatives before declaring a mistrial, id. at 802, and that Gouleed's retrial had thus not violated the double jeopardy clause. Id.

Gouleed then petitioned the federal district court for a writ of habeas corpus. The district court denied the petition, concluding that the decision of the Minnesota Supreme Court comported with clearly established federal law. It nonetheless granted Gouleed's application for a certificate of appealability, and Gouleed timely appealed to this court.

Gouleed's appeal raises no disputed issues of material fact, and we therefore review de novo the district court's denial of habeas corpus relief. Raymond v. Weber, 552 F.3d 680, 683 (8th Cir. 2009).

## II.

Gouleed is not entitled to habeas relief unless he shows that the decision of the Minnesota Supreme Court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court's decision is "contrary to" federal law "if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result. Brown v. Payton, 544 U.S. 133, 141 (2005). A decision involves an "unreasonable application" of federal law if the state court correctly identifies the governing legal rule but applies it in an objectively unreasonable manner, id., unreasonably extends a legal principle to a new factual context where it should not govern, or unreasonably refuses to extend a principle to a context where it should apply, Williams v. Taylor, 529 U.S. 362, 407–08 (2000).

Gouleed's sole claim on appeal is that his retrial violated the double jeopardy clause of the United States Constitution. He submits that the Minnesota Supreme Court's reinstatement of his conviction was contrary to or an unreasonable application of United States Supreme Court precedent construing the double jeopardy clause.

The principles of federal law governing this case are well established. Under the Fifth and Fourteenth Amendments, a state may not twice place a defendant in jeopardy for the same offense. Benton v. Maryland, 395 U.S. 784, 794 (1969). "[R]etrial is not automatically barred," however, "when a criminal proceeding is terminated without finally resolving the merits of the charges against the accused."

Arizona v. Washington, 434 U.S. 497, 505 (1978). When the trial judge declares a mistrial over the defendant's objection, the Constitution permits a second trial if there was "a manifest necessity for the [mistrial], or the ends of public justice would otherwise be defeated." United States v. Perez, 22 U.S. (9 Wheat.) 579, 580 (1824).

The manifest necessity standard does not require that a mistrial be absolutely necessary. Rather, it requires a "high degree" of necessity. Washington, 434 U.S. at 506. Because of the wide variety of circumstances that may require early termination of a criminal trial, the trial judge is afforded "broad discretion" in deciding whether such necessity is present in a particular case. Illinois v. Somerville, 410 U.S. 458, 462 (1973); Perez, 22 U.S. (9 Wheat.) at 580. A court reviewing such a decision, then, must "abjure[] the application of any mechanical formula," Somerville, 410 U.S. at 462, and closely scrutinize the factual context. In determining whether a mistrial is justified by manifest necessity, we are particularly concerned with "'whether less drastic alternatives were available.'" Long v. Humphrey, 184 F.3d 758, 761 (8th Cir. 1999) (quoting United States v. Shafer, 987 F.2d 1054, 1057 (4th Cir. 1993)).

Gouleed offers several distinct arguments to support his contention that the Constitution barred his second trial. He first attacks the trial court's decision making process, arguing that it did not adequately consider less drastic alternatives before declaring the mistrial. Second, he contends that Illinois v. Somerville establishes the only proper analytic framework for his case and that the Minnesota Supreme Court unreasonably applied that precedent. Finally, Gouleed maintains that double jeopardy principles vest in the defendant primary control over the decision whether or not to continue to a verdict in the face of potential prejudice. He argues that the decisions of the state courts afforded inadequate weight to this right since they did not give him the opportunity to accept the striking of Dr. Plunkett's testimony and proceed to verdict. We address each of these arguments in turn.

Gouleed contends first that the trial court failed to consider adequately the potential double jeopardy consequences of its decision and the availability of less drastic remedies for the discovery violation. The Minnesota Supreme Court concluded that the trial judge had sufficiently considered the constitutional problem presented as well as the available remedies. We believe its decision was a reasonable application of federal law.

The Supreme Court has said that "[t]he trial judge . . . 'must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able . . . to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate.'" Washington, 434 U.S. at 514 (quoting United States v. Jorn, 400 U.S. 470, 486 (1971)). The Court has rejected the notion, however, that this principle requires the trial judge to make explicit findings relating to double jeopardy or to discuss the constitutional standard on the record. See id. at 516–17. Rather, the crucial issue is whether the trial judge "deliberate[ly] exercise[d] . . . his discretion." Id. at 517. Thus, a reviewing court's task is to consider the record as a whole "to satisfy [itself] that . . . the trial judge exercised 'sound discretion' in declaring a mistrial," id. at 514, 516–17, with "attention to the particular problem confronting the trial judge," id. at 506.

The record shows that in this case the trial judge properly exercised his discretion. Despite the trial record's silence on double jeopardy issues, the Minnesota Supreme Court concluded that:

> the mistrial decision cannot be said to have been made rashly or altogether without consideration of alternatives. The court took two recesses to allow the parties to ascertain the nature of the violation and

> to consider remedies. Discussions in chambers were had. A continuance and the excision of testimony were at least considered by the court.

Gouleed, 720 N.W.2d at 802.

The trial court proceeded deliberately. The judge clearly articulated the fundamental problem created by Dr. Plunkett's discovery violation, explored potential remedies, and allowed both parties to express their positions on the mistrial. This was an adequate decision making process. See Washington, 434 U.S. at 515–16 (noting importance of hearing positions of counsel); Huss v. Graves, 252 F.3d 952, 955 (8th Cir. 2001) (same); cf. Jorn, 400 U.S. at 487 (finding the "trial judge made no effort to exercise a sound discretion" where he "acted so abruptly in discharging the jury that, had the prosecutor been disposed to suggest a continuance, or the defendant to object to the discharge of the jury, there would have been no opportunity to do so").

Gouleed attacks the trial judge's decision making process as a myopic consideration of possible sanctions for a discovery violation, but the record belies this characterization. The judge's articulation of the reasons for declaring a mistrial made clear that he was aware that the problem was much deeper than a discovery violation. The judge was presented with a fundamental dilemma: to proceed in the face of what was, in his view, incurable prejudice to the prosecution, or to strike Dr. Plunkett's testimony, thereby denying Gouleed all evidentiary support for his defense. Thus, while the judge never used the words "manifest necessity" on the record, his inquiry focused on the same basic question with which that standard is concerned—whether "an impartial verdict cannot be reached." Somerville, 410 U.S. at 464. We agree with the Minnesota Supreme Court that the trial judge sufficiently considered the available remedies to this difficult evidentiary problem.

Gouleed argues next that the Minnesota Supreme Court unreasonably applied Illinois v. Somerville in concluding that his second trial was constitutionally permissible. He contends that the supreme court's decision shows a less drastic

alternative to a mistrial was available—namely, striking Dr. Plunkett's testimony and proceeding to verdict. The availability of this alternative, he claims, takes his case out of the classic manifest necessity framework and permits retrial only under the principles of Illinois v. Somerville. Gouleed interprets Somerville as establishing a two part test distinct from the ordinary manifest necessity standard. According to Gouleed, this test allows retrial only if (1) a mistrial was declared because a procedural error at trial would certainly have led to reversal of a conviction and (2) the mistrial implements a reasonable state policy. Cf. Somerville, 410 U.S. at 471.

Gouleed's argument that the Minnesota Supreme Court recognized that there was a less drastic alternative to the mistrial declared by the trial court rests on the following passage from its decision:

> Striking all or some of Dr. Plunkett's testimony was a remedy available to the [trial] court, but such a remedy would have been a severe sanction for a discovery violation. . . . Ordering the case to be retried preserved Gouleed's ability to fully present his defense and avoided a trial error that would have undoubtedly subjected a verdict of conviction to reversal.

Gouleed, 720 N.W.2d at 802. Gouleed contends the supreme court was wrong in assuming that the striking of Dr. Plunkett's testimony inevitably would have led to reversal if Gouleed had been convicted. Thus, he argues, Somerville does not allow his retrial.

Gouleed's argument suffers from several flaws. First, we reject the premise that the Minnesota Supreme Court recognized that there had been a less drastic alternative to a mistrial in any sense meaningful to double jeopardy analysis. In this context, a "less drastic alternative" does not mean any conceivable option available to the trial judge. It means a reasonable and satisfactory alternative—a solution to a trial problem which strikes a better balance between "the defendant's interest in proceeding to verdict" and the "competing and equally legitimate demand for public justice" than

-9-

would a mistrial. Somerville, 410 U.S. at 471; see Long, 184 F.3d at 761 (mistrial was not necessary where parties "presented the trial court with a variety of mutually acceptable alternatives to mistrial," any of which "would have alleviated . . . potential prejudice to [the defendant] and allowed the trial to continue"). A fair reading of the supreme court's decision makes clear that it did not consider that it would have been a satisfactory alternative to strike Dr. Plunkett's testimony, for the court recognized that striking it would have been extremely prejudicial to Gouleed's defense and "would have undoubtedly subjected a verdict of conviction to reversal." Gouleed, 720 N.W.2d at 802.

The supreme court's conclusion—that striking Dr. Plunkett's testimony had not been a satisfactory option in light of the circumstances—amounted to a conclusion that there had been manifest necessity for the mistrial. Once its decision is seen in this light, it is apparent that Gouleed's claim that striking Dr. Plunkett's testimony would not necessarily have led to a reversal is simply beside the point.

Gouleed's argument is based on a misinterpretation of Somerville. That case did not establish a framework for analyzing double jeopardy issues separate from the manifest necessity standard; it simply applied that standard to a particular set of facts. In Somerville, the trial judge had declared a mistrial when it became clear that an irreparable defect in the indictment would render a verdict of conviction subject to virtually automatic reversal on appeal. See 410 U.S. at 459–60. After reviewing the precedent and the basis for the trial court's decision, the Court "[could not] say that the declaration of a mistrial was not required by 'manifest necessity' or the 'ends of public justice.'" Id. at 469 (quoting Perez, 22 U.S. (9 Wheat.) at 580).

While the Supreme Court obviously found that a procedural error certain to result in reversal was sufficient to justify the mistrial in the case before it, nowhere did it indicate that such a situation is necessary to meet the manifest necessity standard. What Gouleed chooses to interpret as the distinct rule of Somerville is simply the

-10-

Court's articulation of the facts in that case which showed a manifest necessity. See, e.g., Washington, 434 U.S. at 525 & n.11 (Marshall, J., dissenting) ("frequently the 'high degree of necessity' required by the Perez doctrine is present . . . when an error [that would require reversal of a conviction] prompts a mistrial"). Indeed, Somerville explicitly rejects the sort of rigid test Gouleed proposes, emphasizing that "virtually all of the cases turn on the particular facts," 410 U.S. at 464, and that double jeopardy analysis therefore "abjures the application of any mechanical formula," id. at 462.

The determinative issue here is whether there was a "high degree" of necessity for the mistrial, not whether reversal of a conviction would have been certain or merely likely.[3] Washington, 434 U.S. at 506. As the Supreme Court has repeatedly emphasized, the answer to the question of necessity is committed to the discretion of the trial judge; simply because a different judge might have proceeded to verdict in this case (and even avoided reversal on appeal) does not mean the requisite degree of necessity was lacking. In Arizona v. Washington, the trial judge declared a mistrial after defense counsel made improper remarks during his opening statement. Id. at 510. The Court "recognize[d] that the extent of the possible bias [resulting from the improper remarks] cannot be measured, and that . . . some trial judges might have proceeded with the trial after giving the jury appropriate cautionary instructions. In a strict, literal sense, the mistrial was not 'necessary.'" Id. at 511. Nonetheless, the Court "accord[ed] the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected." Id.

---

[3]Though we need not reach the question here, Somerville may require a higher degree of certainty if a mistrial was prompted by prosecutorial error or misconduct. See, e.g., Wilcox v. McGee, 241 F.3d 1242, 1246 (9th Cir. 2001) (per curiam). Where the trial problem is the prosecution's fault, it is proper to require an extremely high degree of necessity before depriving a defendant of his right to "have his trial completed by a particular tribunal." Wade v. Hunter, 336 U.S. 684, 689 (1949). Even though a mistrial can operate "as a post-jeopardy continuance to allow the prosecution an opportunity to strengthen its case," Somerville, 410 U.S. at 469, this case does not present such concerns.

Thus, even if reasonable jurists might disagree over the best remedy for a trial problem, "the trial judge must have the power to declare a mistrial in appropriate cases," for "[t]he interest in orderly, impartial procedure would be impaired if he were deterred from exercising that power by a concern that any time a reviewing court disagreed with his assessment of the trial situation a retrial would automatically be barred." Id. at 513.

These principles guide us here. Regardless of whether striking Dr. Plunkett's testimony would have unquestionably led to reversal of an eventual conviction, it would have been extremely prejudicial to Gouleed, would have subjected any conviction to serious scrutiny on appeal, and ultimately would not have served "the public's interest in fair trials designed to end in just judgments." Wade v. Hunter, 336 U.S. 684, 689 (1949). The mistrial was therefore justified by manifest necessity, and we conclude that the Minnesota Supreme Court did not unreasonably apply federal law in determining that Gouleed's second trial was constitutionally permissible.

We turn finally to Gouleed's argument that the Minnesota courts afforded insufficient weight to his interest in controlling the decision whether or not to proceed to verdict. Gouleed cites United States v. Dinitz, 424 U.S. 600, 609 (1976), for the proposition that "the defendant retain[s] primary control over the course to be followed in the event of" most trial errors. He argues that the Minnesota courts paternalistically denied him his right to proceed to verdict even without Dr. Plunkett's testimony. This argument fails for several reasons.

Gouleed's post hoc argument that he should have been allowed to proceed without Dr. Plunkett's testimony rings hollow, given that at trial he opposed the state's motion to strike. More fundamentally, however, Dinitz is inapposite because it concerns a mistrial declared on the defendant's motion. "Different considerations" apply between cases in which a mistrial is declared over a defendant's objection and those in which "the mistrial has been declared at the defendant's request." Id. at 607.

-12-

In <u>Dinitz,</u> the Court recognized the defendant's right to proceed notwithstanding the possibility of prejudice to his defense "<u>in</u> <u>the</u> <u>absence</u> of circumstances of manifest necessity requiring a sua sponte judicial declaration of mistrial." <u>Id.</u> at 608 (emphasis added). Since there was manifest necessity to grant a new trial in Gouleed's case, his interest in controlling the course of his trial was not dispositive.

To the extent that dicta from <u>Dinitz</u> are relevant here, they simply reiterate considerations inherent in the manifest necessity inquiry. They necessarily balance the defendant's "valued right to have his trial completed by a particular tribunal," <u>Wade</u>, 336 U.S. at 689, with the "public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury," <u>Washington</u>, 434 U.S. at 505. Where, as here, defense misconduct deprives the prosecution of that opportunity, "the public's interest in fair trials designed to end in just judgments must prevail over the defendant's valued right to have his trial concluded before the first jury impaneled." <u>Id.</u> at 516.

## III.

For the reasons discussed, we conclude that the decision of the Minnesota Supreme Court was not "contrary to, or . . . an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). Accordingly, we affirm the order of the district court denying the petition for habeas relief.

_____